## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | : Chapter 11 |
|  | : Case No. 09- **I 3II3** ( ) |
| GigaBeam Corp.,[1] | : |
|  | : |
|  | : |
| Debtor. | : |
|  | : |

**DEBTOR'S MOTION FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 (I)(A) APPROVING PROCEDURES IN CONNECTION WITH SALE OF DEBTOR'S ASSETS; (B) APPROVING FORM OF ASSET PURCHASE AGREEMENT; (C) SCHEDULING AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (D) APPROVING PROCEDURES RELATED TO ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING SALE OF SUCH ASSETS PURSUANT TO ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (B) APPROVING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

GigaBeam Corporation, debtor and debtor in possession (the "Debtor") in the above-captioned case, hereby submits this motion (the "Motion")[2] for entry of an order, pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) (i) approving certain bidding procedures (the "Bidding Procedures") in connection with the Debtor's sale (the "Sale") of certain of its assets (as described more fully below and in the Asset Purchase Agreement, the "Acquired Assets"), (ii) approving the form of the asset purchase agreement (the "Asset Purchase Agreement") in connection with the Sale, substantially in the form attached hereto as Exhibit 3, by and between

---

[1] The Debtor is GigaBeam Corporation, tax identification number **-***7757.

[2] All capitalized terms used but not previously defined herein shall have the meanings ascribed to such terms below.

GigaBeam Corporation and Midsummer Investment, Ltd., individually and as agent (the "Purchaser") (iii) scheduling an auction (the "Auction") in connection with, and hearing (the "Sale Hearing") to consider approval of, the Sale, (iv) approving certain procedures (the "Cure Procedures") related to the assumption of certain executory contracts and unexpired leases, (v) approving the form and manner of notice with respect to the foregoing and (vi) granting certain related relief, and (b) (i) authorizing the Sale pursuant to the Asset Purchase Agreement free and clear of any and all liens, claims, encumbrances and other interests to the Purchaser or the party otherwise submitting the highest and best offer at the Auction (the "Successful Bidder"), (ii) approving the assumption and assignment of the executory contracts and unexpired leases collectively, the "Assumed Contracts") related thereto and (iii) granting certain relief in connection therewith.  In support of this Motion, the Debtor relies on the Declaration of Samuel J. Lawrence in Support of First Day Motions and Applications (the "First Day Declaration"), which was filed with the Court on the Petition Date, and respectfully represents as follows:

## BACKGROUND AND JURISDICTION

1.     On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     An official committee of unsecured creditors  (a "Committee") has not yet been established in this case.  No request has been made for the appointment of a trustee or examiner.

3.     Additional information about the Debtor's business, the events leading up to the Petition Date, and the facts and circumstances surrounding the Debtor and this chapter 11

case can be found in the First Day Declaration, which is incorporated herein by reference as if fully set forth herein.

4.　　This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code, along with Bankruptcy Rules 6004 and 6006.

## RELIEF REQUESTED

5.　　By this Motion, the Debtor seeks entry of an order, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006: (a) approving (i) the Bidding Procedures, a copy of which is attached as Exhibit A to the proposed order annexed hereto as Exhibit 1 (the "Bidding Procedures Order"); (ii) the notice of the Auction and Sale Hearing (the "Auction and Sale Notice"), substantially in the form attached as Exhibit B to the Bidding Procedures Order; (iii) the Publication Notice; and (iv) the notice (the "Assumption and Assignment Notice"), substantially in the form attached as Exhibit D to the Bidding Procedures Order, of the Debtor's proposed assumption and assignment of the Assumed Contracts; (b) approving the Expense Reimbursement for the benefit of the Purchaser and Debtor's estate; (c) approving the form of Asset Purchase Agreement; (d) establishing a date that is no later than October 19, 2009 at 4:00 p.m. (Eastern Time) as the deadline for the submission of bids (the "Bid Deadline"); (e) scheduling the Auction, if necessary, no later than October 28, 2009; (f) scheduling the Sale Hearing for no later than October 29, 2009 to consider the sale of the Acquired Assets to the Purchaser or the Successful Bidder; and (g) granting the Purchaser certain protections under the Bankruptcy Code.

6. The Debtor further requests that the Court enter an order at the Sale Hearing, substantially in the form attached hereto as <u>Exhibit 2</u> (the "Sale Order"): (a) approving a sale to the Purchaser pursuant to the Asset Purchase Agreement, or to the Successful Bidder pursuant to a purchase and sale agreement substantially in the form of the Asset Purchase Agreement; (b) approving the Asset Purchase Agreement, or a substantially similar asset purchase agreement applicable to the Purchaser or the Successful Bidder; and (c) authorizing the Debtor (i) to sell the Acquired Assets, free and clear of any and all liens, claims, encumbrances and interests (other than certain specified assumed liabilities) and (ii) to assume and assign to the Purchaser the Assumed Contracts.

## A. Expense Reimbursement

7. As part of the Bidding Procedures Order, the Debtor is also requesting approval of certain provisions regarding the payment of an Expense Reimbursement (the "Expense Reimbursment"), pursuant to the terms and conditions set forth in the Asset Purchase Agreement. The Purchaser is not willing to make a credit bid without the approval of the Expense Reimbursement. If approved by this Court, the Expense Reimbursement will not exceed one hundred seventy five dollars ($175,000).

## B. Proposed Notice of the Sale Hearing

8. Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with twenty (20) days notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested in the Motion. The Debtor proposes that the deadline for objecting to approval of the Sale shall be October 23, 2009 at 4:00 p.m. (Eastern Time) (the "Sale Objection Deadline").

9.     The Debtor will serve this Motion on: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Debtor's prepetition and postpetition lenders; (c) the parties included on the Debtor's consolidated list of twenty (20) creditors holding the largest unsecured claims; (d) any party which, to the best of the Debtor's knowledge, information and belief, has, in the past year, expressed in writing to the Debtor an interest in buying its business and which the Debtor and its representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transactions contemplated by the Motion; (e) all parties which, to the best of the Debtor's knowledge, information and belief, have asserted a lien or security interest against any of the Acquired Assets; (f) all taxing authorities or recording offices which have a reasonably known interest in relief requested in the Motion; (g) all non-Debtor parties to the Assumed Contracts; and (h) all parties requesting notice pursuant to Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") (collectively, the "Bidding Procedures Notice Parties").

10.     Additionally, upon entry of the Bidding Procedures Order, the Debtor proposes to, not later than three (3) days thereafter, serve notice of the Bidding Procedures Order and the Auction and Sale Hearing, in substantially the form of the Auction and Sale Notice, to the Bidding Procedures Notice Parties and the Debtor's known creditors and interest holders. The Debtor further proposes (a) to provide electronic notification of the Bidding Procedures Order and the Auction and Sale Hearing to interested parties by filing a copy of the Auction and Sale Notice with the Court, and (b) to within seven days after entry of the Bidding Procedures Order, or as soon as practicable thereafter, submit for publication a notice, substantially in the form attached to the Bidding Procedures Order as Exhibit C (the "Publication Notice"), to be

submitted for publication once in a periodical of reasonable circulation, as determined by the Debtor.

11.     The Debtor submits that the foregoing notice procedures satisfy Bankruptcy Rule 2002 and Local Rule 2002-1(b) and provide adequate and sufficient notice of the Sale and related deadlines, including, without limitation, the Bid Deadline and Sale Objection Deadline.

## C.      Proposed Cure Procedures

12.     Additionally, as part of the Sale, the Debtor intends to assume and assign to the Purchaser certain Assumed Contracts.  As soon as practicable, but no later than five (5) days after entry of the Bidding Procedures Order, the Debtor will file and serve the Assumption and Assignment Notice, which notice will include a schedule of cure obligations (the "Cure Schedule") for the Assumed Contracts.  The Cure Schedule will include a description of each Assumed Contract to be assigned to the Purchaser pursuant to the Asset Purchase Agreement, and the amount (the "Cure Cost"), if any, the Debtor believes is necessary to cure each such agreement pursuant to section 365 of the Bankruptcy Code.  A copy of the Assumption and Assignment Notice, together with the Cure Schedule, will be served on each of the non-Debtor parties to the Assumed Contracts on the date that the Assumption and Assignment Notice is filed with the Court.

13.     The Debtor proposes that any objections by the non-Debtor parties to the Assumed Contracts, including, but not limited to, objections relating to adequate assurance of future performance, or to the Cure Costs set forth on the Cure Schedule, must be in writing, filed with the Court and be actually received on or before October 23, 2009 at 4:00 p.m. (Eastern Time) by the following parties: (i) the Debtor, c/o Jay Lawrence, Chief Executive Officer,

GigaBeam Corporation, Commercial Park West, 4915 Prospectus Drive, Suite H, Durham, NC 27713; (ii) counsel to the Purchaser, Olshan Grundman Frome Rosenzweig & Wolosky LLP, Park Avenue Tower, 65 East 55th Street, New York, New York, 10022 (Attn: Adam Friedman, Esquire) and Landis Rath and Cobb, LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801 (Attn: Adam G. Landis, Esquire); (iii) counsel to the Debtor, Ciardi, Ciardi & Astin, 919 N. Market Street, Suite 700, Wilmington, Delaware 19801 (Attn: Daniel K. Astin, Esquire); (iv) the Debtor's investment banker and financial advisor, Focus Management Group, 1650 Market Street, Suite 3600, Philadelphia, Pennsylvania 19103 (Attn: John Bambach); (v) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801; and (vi) counsel to any statutory committee appointed in this case pursuant to section 1102 of the Bankruptcy Code.

14.     However, in the event that the Auction results in a Successful Bidder other than the Purchaser, the Debtor shall file a notice identifying such Successful Bidder, and serve such notice upon each non-Debtor party to the Assumed Contracts, and the deadline for objecting to the assignment of any Assumed Contracts to such Successful Bidder on the basis of adequate assurance of future performance will be the commencement of the Sale Hearing. Any such objection shall set forth a specific default in any Assumed Contracts and claim a specific monetary amount that differs from the Cure Cost, if any, specified in the Assumption and Assignment Notice and the Cure Schedule provided therein.

15.     If no objections are received thereto, the Cure Cost set forth in the Cure Schedule will be binding upon the non-debtor parties to Assumed Contracts for any and all purposes in this chapter 11 case, and will constitute a final determination of the total Cure Costs required to be paid in connection with the Debtor's assumption and assignment of any Assumed

Contracts. Additionally, all non-Debtor parties to the Assumed Contracts will be: (a) forever barred from asserting any additional cure or other amounts with respect to the Assumed Contracts, and the Debtor and the Successful Bidder will be entitled to rely solely upon the Cure Costs set forth in the Assumption and Assignment Notice and the Cure Schedule included therein; (b) deemed to have consented to the Debtor's assumption and assignment of any Assumed Contracts; and (c) forever barred and estopped from asserting or claiming against the Debtor or the Successful Bidder (i) that any additional amounts are due or other defaults exist, (ii) that additional conditions to assumption and assignment must be satisfied by the Debtor or the Successful Bidder or (iii) that there is any objection or defense with respect to the assumption and assignment of such Assumed Contracts.

16.     In the event a non-Debtor party to an Assumed Contract files an objection asserting a cure amount under section 365 of the Bankruptcy Code higher than the proposed Cure Cost (a "Cure Objection"), then (a) to the extent that the parties are able to consensually resolve the Cure Objection prior to the Sale Hearing, the Debtor shall promptly provide any Committee and the Successful Bidder notice and an opportunity to object to such proposed resolution, or (b) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under section 365 of the Bankruptcy Code with respect to such Cure Objection will be determined at the Sale Hearing or at such other date and time as may be fixed by the Court. All objections to the proposed assumption and assignment of Assumed Contracts that are not Cure Objections will be heard at the Sale Hearing to the extent the Debtor is unable to resolve any of these objections in advance of such hearing.

**D.  Proposed Sale to Purchaser**

17.     Shortly after the Petition Date, the Debtor and Purchaser entered into the Asset Purchase Agreement, subject to this Court's approval as well as a higher and better offer for the Acquired Assets.  Below is a summary of the material provisions of the Asset Purchase Agreement.[3]

a.   **Purchase Price**.    Consists  of  $6,096,579.42  (the  "Credit  Bid Amount"), which shall be satisfied in the form of a credit against the Obligations and Seller's obligations under the Pre-Petition Agreements and DIP Facility in accordance with Section 3.1(b) of the Asset Purchase Agreement, plus (i) assumption of the Assumed Liabilities and (ii) a cash payment required to pay the Cure Amounts.

b.   **Acquired Assets**.  Means all of the direct or indirect, right, title and interest of Seller in and to the tangible and intangible assets, properties, rights, claims and Contracts related to the Business (but excluding Excluded Assets) as of the Closing, including but not limited to: (a) all Cash; (b) all accounts receivable, rebates, refunds and other receivables of Seller; (c) all Inventories; (d) all deposits, prepaid expenses, deferred revenue, or advance payments, including customer deposits and pre-paid support obligations, relating to any Acquired Assets; (e) all rights of Seller under each lease and any related agreement for the Leased Property, in each case together with Seller's interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and Seller's rights in respect thereof; (f) all FF&E; (g) all Intellectual Property; (h) all Assigned Contracts; (i) all Documents; (j) all Permits; (k) all rights under or arising out of all insurance policies relating to the Business or the Acquired Assets, unless non-assignable as a matter of law; (l) all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction; (m) any rights, claims or causes of action of Seller for claims arising out of the operation of the Business; (n) all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets; (o) all causes of action arising under Chapter 5 of the Bankruptcy Code relating to the Business and Acquired Assets, including (i) any actions against or otherwise involving any counterparty to any Assigned Contract, any post-Closing employees, officers or directors of the Business including Transferred Employees, and/or any of the Seller's lenders, landlords or vendors and/or

---

[3]  This summary is provided merely for the Court's convenience.  To the extent any inconsistencies exist between the summary provided in this Motion and the actual terms of the Asset Purchase Agreement, the Asset Purchase Agreement shall control.  Capitalized terms used but not otherwise defined in connection with this summary shall have the meanings ascribed to such terms in the Assets Purchase Agreement.

(ii) relating to the ongoing or future operations of the Business; and (p) all goodwill and other intangible assets associated with the Business and the Acquired Assets, including customer and supplier lists.

c. **Excluded Assets**. Includes: (a) any and all rights of the Seller under this Agreement; (b) the Purchase Price payable to Seller under this Agreement; (c) all rights and interests in connection with, and assets of, any Employee Benefit Plan; (d) the capital stock of Seller; (e) the assets listed on Schedule 2.2(e) to the Asset Purchase Agreement; (f) the Carve-Out; (g) all rights under or arising out of insurance policies not relating to the Business or the Acquired Assets or non-assignable as a matter of law; (h) all tax attributes of Seller, provided that any tax refunds remain subject to security interests of the lenders under the Pre-Petition Agreements and the DIP Facility; and (i) all Contracts that are not Assigned Contracts.

d. **Assumed Liabilities**. Includes: (a) all Cure Amounts due and owing under any Assigned Contracts; (b) all of Seller's liabilities and obligations under the Assigned Contracts accruing after the Closing; (c) all ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Closing Date; and (d) those specific liabilities and obligations of Seller identified on Schedule 2.3(e) to the Asset Purchase Agreement; provided, however, that such liabilities and obligations of Seller identified on Schedule 2.3(e), shall only be paid by Purchaser to the extent not satisfied by the Agreed Budget.

e. **Termination**. The Asset Purchase Agreement may be terminated only in accordance with Section 11.1 of the Asset Purchase Agreement. The Asset Purchase Agreement may be terminated at any time before the Closing as follows: (a) by mutual written consent of Seller and Purchaser; (b) automatically and without any action or notice by either Seller to Purchaser, or Purchaser to Seller, immediately upon: (i) the issuance of a final and nonappealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby; (ii) approval by the Bankruptcy Court of an Alternative Transaction; (iii) acceptance by Seller of an Alternative Transaction; or (iv) Purchaser not being declared the winning bidder upon completion of the Auction; (c) by Purchaser: (i) if the Bidding Procedures Order shall not have been entered by September 15, 2009, unless agreed to in writing by Purchaser; (ii) if the Auction has not concluded by October 29, 2009, unless agreed to in writing by Purchaser; (iii) if the Bankruptcy Court has not entered the Bankruptcy Sale Order by October 29, 2009 (or such later date as Purchaser may have designated in writing to Seller); (iv) if there has been a violation or breach by Seller of any material representation, warranty or covenant contained in this Agreement that (x) has rendered the satisfaction of any condition to the obligations of Purchaser impossible or not curable or, if curable, has not been cured within five (5) Business Days following receipt by Seller of written notice of such breach from Purchaser, and (y) has not been waived by Purchaser; (v) at any time after November 10, 2009, if the Closing shall not have occurred and such failure to close is not caused by or the result of Purchaser's breach of this Agreement; (vi) if, prior to the Closing Date, Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the

Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Case; (vii) if Purchaser's obligations under the DIP Facility are terminated; (viii) if either of the interim or final order authorizing and approving the DIP Facility has not been entered within the time periods set forth therein, unless agreed to in writing by Purchaser; or (ix) if there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the opinion of Purchaser in its absolute discretion, prevent it from effectively operating the Business; or (x) if Purchaser so elects in writing pursuant to Section 6.6 of the Asset Purchase Agreement; (d) by Seller, if there has been a violation or breach by Purchaser of any material representation or warranty contained in the Asset Purchase Agreement that (x) has rendered the satisfaction of any condition to the obligations of Seller impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Purchaser of written notice of such breach from Seller, and (y) has not been waived by Seller.

       f.     **Expense Reimbursement**. Means the documented actual, reasonable out-of-pocket costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Purchaser and/or its Affiliates in connection with the negotiation, documentation and implementation of the Asset Purchase Agreement and the transactions contemplated hereby and all proceedings incident thereto up to a maximum of $175,000.

          (i) If the Asset Purchase Agreement is terminated pursuant to (x) Section 11.1(c)(ii), Section 11.1(c)(iii), Section 11.1(c)(iv), Section 11.1(c)(v), Section 11.1(c)(vi) or Section 11.1(c)(viii), solely if the event specified in such applicable Section occurs as a direct result of Seller's actions or inactions, or (y) Section 11.1(b), Section 11.1(c)(i), Section 11.1(c)(vii) or Section 11.1(c)(ix), Purchaser shall be deemed to have earned the Expense Reimbursement. The Expense Reimbursement shall be a super-priority administrative expense priority obligation under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-priority claims of the Seller's post-petition lenders.

          (ii) Purchaser shall have no right to the Expense Reimbursement if the Asset Purchase Agreement is terminated pursuant to Section 11.1(a) or Section 11.1(d).

          (iii)The Expense Reimbursement shall be paid in Cash, without further order of the Bankruptcy Court, only upon and contemporaneous with, the Closing of an Alternative Transaction.

          (iv)Seller acknowledges that the obligation to pay the Expense Reimbursement (to the extent due under the Asset Purchase

Agreement) shall survive the termination of the Asset Purchase Agreement, and shall have super-priority administrative status against Seller and its estate.

g. **General Release.** Effective upon the Closing, Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of Purchaser's pre-Petition Date Claims, Encumbrances, and Liens) against Purchaser and any of its Related Persons, that directly or indirectly arise out of, are based upon, or in any manner are connected with the pre-Petition Date agreements to which Purchaser (or its Affiliates) and the Seller were parties and all transactions referred to in such agreements (the "Released Claims"). Should any Released Claims nonetheless exist, the Seller, on behalf of itself and its estate, hereby (i) releases and discharges each of Purchaser and its Related Persons from any liability whatsoever on such Released Claims and (ii) releases, waives and discharges all such Released Claims against Purchaser and its Related Persons.

## BASIS FOR RELIEF REQUESTED

**A.    The Sale is Within the Sound Business Judgment of the Debtor and Should be Approved**

18.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

19.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the Debtor have obtained a fair and reasonable price, and (d) good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtor submits that the decision to proceed with the Sale and the Bidding Procedures related thereto is based upon its sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

20.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is

13

proper. In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

21.     The Debtor submits that more than ample business justification exists to sell the Acquired Assets to the Purchaser (or the Successful Bidder) pursuant to the Bidding Procedures. The Debtor believes that the sale process proposed herein is most likely to achieve the highest and best price for the Acquired Assets. Furthermore, the Debtor does not have sufficient funding to delay the sale process for any significant period of time beyond the timeframe proposed herein, and the Acquired Assets will only decline in value absent a prompt Sale. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtor's estate for the benefit of its stakeholders.

22.     The Auction and Sale Notice, substantially in the form attached as Exhibit B to the Bidding Procedures Order, is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets. Also, the Debtor has actively marketed the Acquired Assets. Accordingly, the Sale satisfies the second prong of the Abbotts Dairies standard.

23.     Moreover, the Bidding Procedures are designed to maximize the value received for the Acquired Assets. Under the facts and circumstances of this chapter 11 case, the process proposed herein by the Debtor allows for a timely and efficient auction process, while providing bidders and consultants with ample time and information to submit a timely bid. The Bidding Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price. The Debtor is subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the assets. The Sale will be further subject to a market check through the solicitation of competing bids in a Court-supervised auction process as set forth in the Bidding Procedures. Therefore, the Debtor and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and therefore, the third prong of the <u>Abbotts Dairies</u> standard is satisfied. As discussed below, the "good faith" prong of the <u>Abbotts Dairies</u> standard is also satisfied here.

**B.     The Expense Reimbursement Requested Herein Is Reasonable and Should be Approved**

24.     Local Rule 6004-1(c)(i)(C) provides that a bidding procedures motion must highlight "[a]ny provisions providing an initial or 'stalking horse' bidder a form of bid protection." L.R. Bankr. P. 6004-1(c)(i)(C). The Debtor has complied by including herein the amount sought as an Expense Reimbursement by the Purchaser.

25.     In <u>Calpine Corp. v. O'Brien Environmental Energy, Inc.</u> (<u>In re O'Brien Environmental Energy, Inc.</u>), the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee and expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the break-up fee and expense reimbursement; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee and expense reimbursement relative to the purchase price; (4)

whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee and expense reimbursement "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of the break-up fee and expense reimbursement; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee and expense reimbursement] on unsecured creditors, where such creditors are in opposition to the break-up fee." See In re O'Brien, 181 F.3d at 536.

26.     The Debtor submits that the foregoing factors are met under the facts and circumstances of this case, as the proposed Expense Reimbursement is necessary to the success of the auction and sale process and therefore provides an actual benefit to the Debtor's estate. Although the Purchaser has extended credit to the Debtor in the past and is already familiar with the Debtor and its business, the Asset Purchase Agreement and the Expense Reimbursement are the result of arms' length, good faith negotiation between the parties. The Purchaser was unwilling to enter into the Asset Purchase Agreement without the protection provided by the Expense Reimbursement, and the Auction contemplated hereby will initiate an overbid process at a floor price that is desirable for the Debtor, thereby increasing the likelihood that the sales price will represent the true worth of the Acquired Assets.

27.     By ensuring the existence of a "floor" purchase price under the Asset Purchase Agreement, the Expense Reimbursement will therefore induce bids that potentially may have never been made and without which bidding may be limited. In sum, the Debtor's ability to provide the Expense Reimbursement enables them to ensure sales to contractually-committed

bidders at prices they believe to be fair, while providing the Debtor with the potential of even greater benefit to the estate. Further, the Expense Reimbursement was and is a material inducement for, and condition of, the Purchaser's offer to purchase the Acquired Assets. The Purchaser is unwilling to commit to hold open its offer without such protection.

28. The Debtor submits that the proposed Expense Reimbursement will not chill bidding, is reasonable and will enable the Debtor to maximize the value of its estate. The Asset Purchase Agreement establishes a legitimate price floor allowing the Debtor to evaluate properly other competing bids that may be materially higher or otherwise better than the Purchaser's bid. The amount of the Expense Reimbursement constitutes "a fair and reasonable percentage of the proposed purchase price." In re S.N.A. Nut Company, 186 B.R. at 103; In re Tama Beef Packing, Inc., 312 B.R. at 198-199. See In re Financial News Network, Inc., 980 F.2d 165, 167 (3d Cir. 1992) (noting that the break-up fee on the $149.3 million sale transaction at issue was $8.2 million, or over 5% of the sale price). The Expense Reimbursement is customary for similar transactions of this type in the bankruptcy context and therefore is not "so substantial that it provides a 'chilling effect' on other potential bidders." In re S.N.A. Nut Company, 186 B.R. at 103. See also In re Wintz Companies d/b/a Milbank Freightways, 230 B.R. 840, 847 (8th Cir. B.A.P. 1999).

29. In sum, the Expense Reimbursement provided for in the Asset Purchase Agreement was the product of arms' length negotiations between the Debtor on one side and the Purchaser on the other. Without these protections, the Purchaser would not have made its offer, and such protections are warranted in light of Purchaser's role in the Sale.

## C. The Bidding Procedures Are Reasonable and Appropriate

30.    The Debtor submits that under the facts and circumstances surrounding its proposed sale of the Acquired Assets and this chapter 11 case generally, the Bidding Procedures are reasonable and appropriate and necessary to its efforts to preserve and maximize estate value. The Debtor reserves its right to modify such procedures as necessary or as it deems appropriate (after consultation with its secured lenders and any Committee) to maximize the value of its estate. In addition, the Debtor reserves the right to withdraw any or all Acquired Assets from the Sale at any time prior to Court approval of the Sale, subject to any limitations provided for in the Asset Purchase Agreement.

31.    Local Rule 6004-1(b)(iv)(F) provides that "[t]he Sale Motion must highlight whether the proposed purchaser has submitted, or will be required to submit, a good faith deposit and, if so, the conditions under which such deposit may be forfeited." L.R. Bankr. P. 6004-1(b)(iv)(F). As set forth in the Bidding Procedures, the Purchaser has not and is not required to submit a good faith deposit. However, any Qualified Bidder (as defined in the Bidding Procedures) wishing to bid for the Acquired Assets must submit a $200,000 good faith deposit. The Good Faith Deposit of the Successful Bidder shall be applied to the purchase price of such transaction at Closing. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until five (5) days after Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtor shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

32.     Local Rules 6004-1 (c) (i)(A) and (B) further provide that a bidding procedures motion such as this must highlight "[a]ny provision governing any entity becoming a qualified bidder" and "[a]ny provision governing a bid being a qualified bid." Id. 6004-1 (c)(i)(A) and (B).  The Bidding Procedures, attached as Exhibit A to the Bidding Procedures Order, provide as follows with respect to qualifying bids:[4]

a.     **Participation Requirements**.  To participate in the bidding process or to otherwise be considered for any purpose hereunder, a person interested in all or portions of the Acquired Assets (a "Potential Bidder") must first deliver (unless previously delivered) to the Debtor, its counsel, and any official committee appointed in this chapter 11 case, not later than ten days from entry of the Bidding Procedures Order:

- *Confidentiality Agreement.*  An executed confidentiality agreement in form and substance acceptable to the Debtor and its counsel;

- *Identification of Potential Bidder.*  Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction;[5] and

b.     **Designation as Qualified Bidder**.  A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the assets of the Debtor do not overlap and who agree to have its bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in subparagraphs (a) and (b) below, and that the Debtor in its discretion and with assistance from its advisors determine is reasonably likely to submit a *bona fide* offer that would result in greater cash value being received for the benefit of the Debtor's creditors than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below).

- *Corporate Authority.*  Within ten (10) days prior to the Bid Deadline (defined below), written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; provided, however, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated

---

[4] To the extent any inconsistencies exist between the summary provided in this Motion and the actual terms of the Bidding Procedures, the Bidding Procedures shall control.  Capitalized terms used but not otherwise defined in connection with this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

[5] An interested party need not be a Qualified Bidder to access the data room, but must submit the confidentiality agreement and must comply with the identification requirements.

transaction, then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtor of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals"); and

- *Proof of Financial Ability to Perform.* Within ten (10) days prior to the Bid Deadline, written evidence that the Debtor reasonably conclude demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, *inter alia*, the following: (i) the Potential Bidder's current financial statements (audited if they exist); (ii) contact names and numbers for verification of financing sources; (iii) evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and (iv) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Potential Bidder has the ability to close the contemplated transaction; provided, however, that the Debtor shall determine, in its reasonable discretion, in consultation with the Debtor's advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications.

c. Upon the receipt from a Potential Bidder of the information required the Bid Procedures, the Debtor, as soon as is practicable, shall determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder.

d. The Purchaser shall be deemed a Qualified Bidder.

33. Local Rule 6004-1(c)(i)(C) requires that a bidding procedures motion such as this must highlight, "[a]ny requirement regarding the amount of the initial overbid and any successive bidding increments." Id. The Bidding Procedures, attached as Exhibit A to the Bidding Procedures Order, provide as follows with respect to the initial overbid and any successive bidding increments:

a **Minimum Overbid**. The consideration proposed by the Bid can include only cash. The aggregate consideration must equal or exceed the sum of the Purchase Price plus $275,000.

b. **Terms of Overbids**. An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

i.    Minimum Overbid Increment

Any Overbid after the Baseline Bid shall be made in increments of at least $100,000. Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash; provided, however, notwithstanding the foregoing, any Overbid by the Purchaser may be a credit bid under section 363(k) of the Bankruptcy Code, either in full or in part.

ii.    Remaining Terms are the Same as for Qualified Bids

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtor accept a higher Qualified Bid as an Overbid and (ii) such Overbid is not selected as the Back-up Bid (as defined below).

To the extent not previously provided (which shall be determined by the Debtor), a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

iii.    Announcing Overbids

The Debtor shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtor's estate based on, *inter alia*, the Bid Assessment Criteria.

iv.    Consideration of Overbids

The Debtor reserves the right, in its reasonable business judgment, and, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtor and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor in its reasonable business judgment may require, that the Qualified Bidder (other than the Purchaser) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount.

34.    Local Rule 6004-1(c)(i)(D) requires that a bidding procedures motion such

as this must highlight, "[a]ny provision that would authorize a debtor, without further order of the Court, to modify any procedures regarding bidding or conducting an auction." Id. The Bidding Procedures, attached as Exhibit A to the Bidding Procedures Order, provide as follows with respect to the modification of any procedures regarding bidding or conducting an auction:

> a.  **Additional Procedures**.  The Debtor may adopt rules for the Auction at or prior to the Auction that, in its reasonable discretion, will promote the goals of the Auction and that is not inconsistent with any of the provisions of the Bidding Procedures Order, provided, however, that the Terms of the Overbids shall not be modified without the Purchaser's consent if a subsequent bid, including the Overbid amount, is not sufficient to satisfy all of the Purchaser's claims and outstanding obligations under the DIP Credit Agreements, the prepetition Credit Agreements and the Expense Reimbursement.  All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

**D.  The Proposed Notice of the Bidding Procedures is Appropriate**

35.     The Debtor believes that it will obtain the maximum recovery for its creditors if its assets are sold expeditiously, through a Court-supervised auction and sale process, such as the one provided for herein.  The Debtor, with the assistance of its professional advisors, are in the process of actively marketing the Acquired Assets.  In doing so, the Debtor has contacted dozens of potential purchasers and/or investors.  Despite these significant efforts, it has been unable to identify any prospective purchasers other than the Purchaser.  Against this backdrop, the Debtor believes that its service of the Auction and Sale Notice, as previously described herein, is reasonable and appropriate and satisfies any and all requirements for such notice under the Bankruptcy Code, Bankruptcy Rules and Local Rules.

36.     Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify

creditors of the proposed sale of the Debtor's assets, including a disclosure of the time and place

of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The

Debtor respectfully submits that the notice procedures described herein, including, without

limitation, the service of the Auction and Sale Notice, satisfy Bankruptcy Rule 2002, and are

reasonably calculated to provide timely and adequate notice of the Sale to all parties in interest in

this chapter 11 case, as well as to those parties which have expressed an interest, or may express

an interest, in bidding on the Acquired Assets.  The Debtor's prepetition marketing efforts, along

with the proposed period of time between the filing of this Motion and the commencement of the

bidding process and the Auction, should give any and all interested purchasers more than enough

time to participate in earnest in the auction and sale process proposed herein.

**E.     The Sale of the Debtor's Assets Free and Clear of Liens
and Other Interests is Authorized by Section 363(f)**

37.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell all or any part of its property free and clear of any and all liens, claims, encumbrances, or

interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law;

(ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien

and the purchase price for the property is greater than the aggregate amount of all liens on the

property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien,

claim or interest could be compelled, in a legal or equitable proceeding, to accept a money

satisfaction for such interest.  11 U.S.C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In

re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is

written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least

one of the subsections is met).  Because the Debtor expects that it will satisfy, at minimum, the

second and fifth of these requirements, if not others as well, approving the Sale free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**F.     Assumption and Assignment of Certain
         Executory Contracts and Unexpired Leases**

         38.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp., 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting Stable Mews Assoc., 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co.

v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

39.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. See In re Rickel Home Centers, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets).

40.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from Debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

41.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. See In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a) of the Bankruptcy Code, a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

42.     The Debtor respectfully submits that Cure Procedures are appropriate and reasonably tailored to provide non-debtor parties to the Assumed Contracts with adequate notice of the proposed assumption and assignment of its respective contracts, as well as proposed Cure Costs, if any. Such non-debtor parties to the Assumed Contracts will then be given an opportunity to object to such Cure Costs. The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues, including any adequate assurance of future performance issues. Accordingly, the Debtor submits that

implementation of the Cure Procedures is appropriate under the facts and circumstances of this case and the proposed sale.

### G. The Successful Bidder Should be Afforded All Protections Under Section 363(m) of the Bankruptcy Code as a Good Faith Purchaser

43. The Debtor requests that the Court find that the Purchaser is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

44. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

45. Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

46. The Debtor submits, and will present evidence at the Sale Hearing if necessary that, as set forth above, the Asset Purchase Agreement was an intensely negotiated, arms' length transaction, in which the Purchaser acted in good faith. Indeed, the Purchaser's identity has been fully disclosed in these proceedings, and the Debtor has fully disclosed and requested the Court's approval of all of the terms and conditions of the Sale. Accordingly, the Debtor requests that the Court to find that the Purchaser has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**H. Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

47.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an order "authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

48.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay periods, Collier on Bankruptcy suggests that the ten-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

49.     As described above, time is clearly of the essence as the Debtor lacks sufficient funding to operate its business on a prolonged basis. Since promptly closing the Sale is of critical importance, the Debtor hereby requests that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## I. Additional Disclosures Required Pursuant to Local Rule 6004-1

51. Local Rule 6004-1 requires that a bidding procedures motion such as this must highlight certain provisions. To the extent not already disclosed herein, the Debtor discloses as follows:

i. This Motion seeks approval of substantially all of the Debtor's assets, and pursuant to Local Rule 6004-1(b)(4)(J), Section 7.2 of the Asset Purchase Agreement provides that the Debtor will have reasonable access to books and records from and after the Closing Date.

ii. Pursuant to Local Rule 6004-1(b), Section 2.1(o) of the Asset Purchase Agreement provides for the transfer to the Purchaser of the Debtor's causes of action under chapter 5 of the Bankruptcy Code.

## NOTICE

50. Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Debtor's prepetition and postpetition lenders; (c) the parties included on the Debtor's consolidated list of twenty (20) creditors holding the largest unsecured claims; (d) any party which, to the best of the Debtor's knowledge, information and belief, has, in the past year, expressed in writing to the Debtor an interest in buying its business and which the Debtor and its representatives reasonably and in good faith determine potentially have the financial wherewithal to effectuate the transactions contemplated by the Motion; (e) all parties which, to the best of the Debtor's knowledge, information and belief, have asserted a lien or security interest against any of the Acquired Assets; (f) all parties to the Assumed Contracts; (g) all taxing authorities, recording offices and

government agencies which have a reasonably known interest in the relief requested in the Motion, including the Internal Revenue Service; and (h) all parties requesting notice pursuant to Local Rule 2002-1(b). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit A, granting the relief requested in the Motion and such other and further relief as is just and proper.

Dated: September 2, 2009  
       Wilmington, Delaware

CIARDI CIARDI & ASTIN

*/s/ Mary E. Augustine*  
Daniel K. Astin (No. 4068)  
Anthony M. Saccullo (No. 4141)  
Mary E. Augustine (No. 4477)  
Carl D. Neff (No. 4895)  
919 N. Market Street, Suite 700  
Wilmington, Delaware 19801  
Tel: (302) 658-1100  
Fax: (302) 658-1300  
dastin@ciardilaw.com  
asaccullo@ciardilaw.com  
maugustine@ciardilaw.com  
cneff@ciardilaw.com

*Proposed Attorneys for the Debtor*