## <u>EXHIBIT 3</u>

Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

**By and Between**

**GIGABEAM CORPORATION**

**(As Seller)**

**AND**

**MIDSUMMER INVESTMENT, LTD (individually and as Agent)**

**(as Purchaser)**

**Dated as of September 2, 2009**

## TABLE OF CONTENTS

**ARTICLE 1** DEFINITIONS ...................................................................................................1

    1.1    Certain Terms Defined. ...........................................................................1
    1.2    Interpretation. .......................................................................................9

**ARTICLE 2** PURCHASE AND SALE OF THE ACQUIRED ASSETS ..................................10

    2.1    Purchase and Sale of Assets. ................................................................10
    2.2    Excluded Assets. ...................................................................................11
    2.3    Assumption of Liabilities. .....................................................................12
    2.4    Excluded Liabilities. .............................................................................12
    2.5    Assignment and Assumption of Contracts. ...........................................13

**ARTICLE 3** CONSIDERATION ..........................................................................................14

    3.1    Purchase Price. ......................................................................................14
    3.2    Allocation of Purchase Price. ................................................................14

**ARTICLE 4** REPRESENTATIONS AND WARRANTIES OF SELLER ................................15

    4.1    Corporate Organization. .......................................................................15
    4.2    No Subsidiaries. ....................................................................................15
    4.3    Authorization of Agreement. ................................................................15
    4.4    Conflicts; Consents of Third Parties. ....................................................16
    4.5    Title to Acquired Assets. .......................................................................16
    4.6    Contracts. .............................................................................................17
    4.7    Property. ...............................................................................................18
    4.8    Intellectual Property. ............................................................................18
    4.9    Permits. ................................................................................................18
    4.10   Employee Benefit Plans. .......................................................................18
    4.11   Labor Relations. ...................................................................................19
    4.12   Environmental Matters. ........................................................................19
    4.13   Insurance. .............................................................................................20
    4.14   No Brokers or Finders. .........................................................................20
    4.15   Litigation; Proceedings. ........................................................................20
    4.16   Customers and Suppliers. .....................................................................20
    4.17   Taxes. ...................................................................................................21
    4.18   Board Approval and Recommendations. ...............................................21
    4.19   Compliance with Laws. ........................................................................21
    4.20   No Alternative Transactions. ................................................................22

**ARTICLE 5** REPRESENTATIONS AND WARRANTIES OF PURCHASER..........................22

    5.1    Corporate Organization. .......................................................................22
    5.2    Authorization and Validity. ..................................................................22
    5.3    No Conflict or Violation. .......................................................................22

5.4    No Broker or Finder. .................................................................22

**ARTICLE 6** COVENANTS AND OTHER AGREEMENTS .............................23

6.1    Pre-Closing Covenants of Seller. .............................................23
6.2    Pre-Closing Covenants of Purchaser. .......................................25
6.3    Other Covenants of Seller and Purchaser. ................................26
6.4    Employment Covenants and Other Undertakings. ......................26
6.5    Non-Assignment of Contracts. ................................................28
6.6    Casualty. .............................................................................28
6.7    Name Change. ......................................................................29

**ARTICLE 7** TAXES ...............................................................................29

7.1    Taxes Related to Purchase of Acquired Assets. .........................29
7.2    Cooperation. ........................................................................29

**ARTICLE 8** BANKRUPTCY COURT MATTERS .......................................30

8.1    Motions. ..............................................................................30
8.2    Assigned Contracts. ..............................................................30
8.3    Procedure. ...........................................................................30

**ARTICLE 9** CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES ..........31

9.1    Conditions Precedent to Performance by Seller. ........................31
9.2    Conditions Precedent to the Performance by Purchaser. ............32

**ARTICLE 10** CLOSING AND DELIVERIES ..............................................33

10.1    Closing. .............................................................................33
10.2    Seller's Deliveries. .............................................................33
10.3    Purchaser's Deliveries. .......................................................34

**ARTICLE 11** TERMINATION .................................................................35

11.1    Conditions of Termination. ...................................................35
11.2    Effect of Termination. .........................................................36
11.3    Expense Reimbursement. .....................................................36

**ARTICLE 12** MISCELLANEOUS .............................................................37

12.1    Survival. ............................................................................37
12.2    Further Assurances. ............................................................37
12.3    Successors and Assigns. ......................................................37
12.4    Governing Law; Jurisdiction. ................................................38
12.5    Expenses. ...........................................................................38
12.6    Severability. .......................................................................38

| 12.7 | Notices. | 38 |
| 12.8 | Amendments; Waivers. | 39 |
| 12.9 | Entire Agreement. | 40 |
| 12.10 | Publicity. | 40 |
| 12.11 | Headings. | 40 |
| 12.12 | Counterparts; Facsimile Copies. | 40 |
| 12.13 | Negotiated Agreement. | 40 |
| 12.14 | Construction. | 40 |
| 12.15 | Waiver of Jury Trial. | 41 |
| 12.16 | General Release. | 41 |

## EXHIBITS

Exhibit A        Bankruptcy Sale Order

Exhibit B        Bidding Procedures Order

Exhibit C        Bill of Sale

Exhibit D        Assignment and Assumption Agreement

## SCHEDULES

Schedule 1.1(a)    Liens for Taxes not yet due

Schedule 1.1(b)    Statutory Liens

Schedule 2.1(e)    Leased Real Property of Seller

Schedule 2.2(e)    Certain Excluded Assets

Schedule 2.3(e)    Identified Liabilities and Obligations of Seller

Schedule 2.5(a)    Assignable Contracts

Schedule 2.5    Cure Schedule

Schedule 3.1    Principal Amount of Pre-Petition Lenders' Debt

Schedule 4.2    Subsidiaries

Schedule 4.4(a)    Conflicts

Schedule 4.4(b)    Consents

Schedule 4.5    Permitted Exceptions

Schedule 4.6(a)    Material Contracts

Schedule 4.6(b)    Material Modifications of Assigned Contracts

Schedule 4.6(c)    Non-monetary Defaults

Schedule 4.8(a)    Exceptions to Intellectual Property Representation

Schedule 4.8(b)(i)    Intellectual Property

Schedule 4.8(b)(ii)    Sublicenses to Intellectual Property

Schedule 4.9          Permits

Schedule 4.10         Employee Benefit Plans

Schedule 4.11(a)      Exceptions to Labor Relations Representation

Schedule 4.11(b)      Employees

Schedule 4.11(d)      Key Employees

Schedule 4.13         Insurance Policies

Schedule 4.14         Brokers, etc. Acting for Seller

Schedule 4.15         Exceptions to Litigation Representation

Schedule 4.16         Customers and Suppliers

Schedule 4.17         Taxes

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 2, 2009 (the "Execution Date"), is made by and between GigaBeam Corporation, a Delaware corporation (the "Seller"), and Midsummer Investment, Ltd., a Bermuda company (individually and as Agent, and together with its successors, assigns and/or designees, collectively, the "Purchaser").

## RECITALS

WHEREAS, Seller is engaged in the business of offering fixed wireless communication equipment and design and implementation services of fixed wireless networks using its products (the "Business");

WHEREAS, on the date hereof (the "Petition Date"), Seller intends to file a voluntary petition for reorganization relief (the "Bankruptcy Cases") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and in concert with such filing, seek the entry of an order by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approving this Agreement and authorizing Seller to consummate the transactions contemplated hereby and by other transaction documents;

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets and Assumed Liabilities as more specifically provided herein;

WHEREAS, the Board of Directors of Seller has determined that it is advisable and in the best interests of its estate and the beneficiaries of such estate to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Bankruptcy Sale Order and has approved this Agreement;

WHEREAS, certain terms used in this Agreement are defined in Section 1.1; and

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bankruptcy Sale Order to be entered in the Bankruptcy Cases;

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Seller and Purchaser hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Certain Terms Defined.

As used in this Agreement, the following terms have the following meanings:

"Acquired Assets" are those assets described in Section 2.1.

"Action" means any demand, claim, action, suit or proceeding, arbitral action, inquiry, criminal prosecution or investigation by or before any Governmental Authority.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or use the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agent" means the Purchaser as administrative agent and collateral agent for the Pre-Petition Lenders indentified in the Pre-Petition Agreements and as administrative agent and collateral agent for the DIP Lenders identified in the DIP Facility.

"Agreed Budget" has the meaning set forth in the DIP Facility.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Statement" has the meaning set forth in Section 3.2.

"Alternative Transaction" means a transaction or series of related transactions pursuant to which the Seller (i) accepts a Qualified Bid, other than that of Purchaser, as the highest or best offer, or (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including but not limited to a Court-approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser, or seeks to do any of the foregoing as set forth in this clause (ii).

"Ancillary Agreement" means any other agreement, document or instrument that Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby.

"Assignable Contract" means any Contract to which Seller is a party and is permitted under the Bankruptcy Code to sell and assign, other than an Employee Benefit Plan.

"Assigned Contracts" has the meaning set forth in Section 2.5(a).

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in substantially the form annexed hereto as Exhibit D evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" means the auction for the sale of Seller's assets conducted by Seller if any Qualified Bid is received pursuant to the Bidding Procedures Order.

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Sale Order" means an order, in all material respects in the form of Exhibit A, issued by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to Purchaser in its sole discretion.

"Bidding Procedures Motion" means a motion, in form and substance satisfactory to Purchaser, to approve the Bidding Procedures Order.

"Bidding Procedures Order" means an order, in all material respects in the form of Exhibit B, issued by the Bankruptcy Court that, among other things, approves the Expense Reimbursement, establishes procedures for an auction process to solicit competing bids, and authorizes Purchaser to credit bid up to the Credit Bid Amount.

"Bill of Sale" means the Bill of Sale in all material respects in the form of Exhibit C conveying to Purchaser title to all of the Acquired Assets.

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York or Delaware are authorized by Law or other governmental action to close.

"Business Employees" means employees of the Business on the date hereof.

"Carve-Out" has the meaning set forth in the DIP Facility.

"Cash" means all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments.

"Casualty" has the meaning set forth in Section 6.6.

"Claim" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

3

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"Contract" means any agreement, contract, lease, sublease, purchase order, arrangement, license, commitment or other binding arrangement or understanding, whether written or oral, and any amendments, modifications or supplements thereto.

"Credit Bid Amount" has the meaning set forth in Section 3.1(a).

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Cure Schedule" has the meaning set forth in Section 2.5(a).

"DIP Facility" means that certain Post-Petition Senior Secured Super-Priority Credit Agreement, of even date herewith, by and among Seller as borrower, the DIP Lenders from time to time as lenders, and Purchaser as Agent, as amended, modified or restated.

"DIP Lenders" means Purchaser and any other Pre-Petition Lender that elects to become a lender under the DIP Facility.

"DIP Orders" means the interim and final orders of the Bankruptcy Court approving the DIP Facility in a form acceptable to the Agent, the DIP Lenders, and Seller.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, Web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting and Tax files, all files, customer files and documents (including credit information), personnel files for employees, supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, Intellectual Property, and other similar materials to the extent related to, used in, held for use in, or with respect to, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the premises of the Business, but excluding (i) personnel files for employees of Seller who are not hired by Purchaser as of the Closing Date (except records necessary for Purchaser to provide COBRA coverage if required by Law) and (iii) any materials exclusively related to any Excluded Assets.

"Employee Benefit Plans" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or

4

with respect to which any obligation to contribute has been undertaken) by Seller or any ERISA Affiliate and that covers any current or former employee, director, or consultant of Seller (or their dependents, spouses or beneficiaries).

"Encumbrances" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to Seller personally, other agreement term tending to limit any right or privilege of Seller under any Contract, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"Environmental Laws" has the meaning set forth in Section 4.12.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade of business (whether or not incorporated) that is treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement" means the documented actual, reasonable out-of-pocket costs and expenses (including, without limitation, fees and expenses of counsel) incurred by Purchaser and/or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and all proceedings incident thereto up to a maximum of $175,000.

"Federal Rules of Bankruptcy Procedure" means the rules of bankruptcy courts promulgated by the United States Supreme Court and published as an appendix to title 11 of the United States Code.

"FF&E" means all fixed assets, equipment, machinery, fixtures, furniture and other tangible property owned by Seller located at any premises of Seller (unless sold to any third party in the ordinary course of business otherwise than in violation of this Agreement) or used or useful in the operation of the Business and Acquired Assets (including all such property that is damaged), including all attachments, signs, cabinets, partitions, wiring, telephones, security systems, floor coverings, wall coverings, office equipment, computers and other information technology hardware, safes, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

5

"Governmental Authority" means any federal, state, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"Hazardous Materials" shall mean (a) any petroleum products or byproducts, radioactive materials, friable asbestos or polychlorinated biphenyls or (b) any waste, material, or substance defined as a "hazardous substance," "hazardous material," or "hazardous waste" or "pollutant" or otherwise regulated under any applicable Environmental Law.

"Improvements" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Leased Property.

"Intellectual Property" means all rights of Seller and its Affiliates in and to (a) all United States and foreign patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademark registrations, unregistered trademarks, service marks, trade dress, logos, trade names and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) Internet addresses, uniform resource locaters, domain names, Websites and Web pages, (h) any and all other intellectual property and proprietary rights, (i) company-wide telephone numbers and (j) goodwill related to all of the foregoing, in each case to the extent used or useful in the operation of the Business or related to the Acquired Assets.

"Interest" means "interest" as that term is used in Bankruptcy Code section 363(f).

"Inventories" means all inventories of materials, work-in-process, finished goods and supplies owned or held for sale by Seller or that are otherwise included in the Acquired Assets and are permitted to be sold and transferred under applicable Law.

"Law" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order, judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"Lease Assignments" has the meaning set forth in Section 10.2(c).

6

"Leased Property" means all the real property leased, subleased or licensed by Seller, all of which are described on Schedule 2.1(e), and are used in connection with the operation of the Business.

"Lenders Debt" has the meaning set forth in Section 3.1(a).

"Lien" has the meaning given to that term in the Bankruptcy Code.

"Local Bankruptcy Rules" means the local rules of bankruptcy courts promulgated under Rule 9029(a) of the Federal Rules of Bankruptcy Procedure for the District of Delaware.

"Material Adverse Effect" means a state of facts, event, change or effect with respect to the Business, Acquired Assets, the Assumed Liabilities or the enforceability of any Assigned Contract that results in a material adverse effect on the value of the Acquired Assets or the Business, taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (a) changes in economic, regulatory or political conditions generally; (b) the usual, customary or ordinary consequences of the filing by a debtor of a Bankruptcy Cases contemplating a reorganization or liquidation of the debtor's assets; and (c) any consequences to the Business resulting from the announcement of the sale transaction contemplated by this Agreement and the process to obtain approval of the procedures to obtain approval thereof.

"Obligations" means collectively the "Pre-Petition Obligations" and the "DIP Obligations" both as defined in the DIP Orders.

"Orders" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"Organizational Amendment" has the meaning set forth in Section 6.7.

"Permits" means all certificates of occupancy or other certificates, permits, authorizations, filings, approvals and licenses used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"Permitted Exceptions" has the meaning set forth in Section 4.5.

"Permitted Liens" means: (a) Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings, which are listed on Schedule 1.1(a); (b) statutory liens arising in the ordinary course of business that are not overdue and that do not materially affect the value or use of the affected asset, all of which are listed on Schedule 1.1(b); (c) pledges or deposits in connection with workers' compensation, unemployment insurance and other social-security legislation; and (d) easements, rights-of-way, restrictions and other similar encumbrances other than monetary encumbrances, judgments and monetary liens that in each case do not in any case materially detract from the value or use of the property subject thereto or materially interfere with the ordinary conduct of the business of Seller at the property subject thereto.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Pre-Petition Agreements" means that certain Securities Purchase Agreement dated as of April 30, 2008, the Original Issue Discount Secured Convertible Debentures due April 30, 2010, and the Security Agreement dated as of April 30, 2008, as the same have been and may hereafter be amended, supplemented or otherwise modified, in each case by and among the Seller as Borrower, GigaBeam Service Corporation, as Guarantor, the Pre-Petition Lenders named therein, and Purchaser as Agent for the Pre-Petition Lenders, and all documents and instruments entered into in conjunction therewith or in conjunction with the transactions contemplated thereby or that are related or ancillary to any of the foregoing.

"Pre-Petition Lenders" means the lender parties indentified in the Pre-Petition Agreements.

"Purchaser" has the meaning set forth in the Preamble.

"Purchase Price" has the meaning set forth in Section 3.1.

"Qualified Bid" means a competing bid pre-qualified for the Auction in accordance with the Bidding Procedures Order.

"Related Person" means, with respect to any Person, all present and future directors, officers, members, managers, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"Released Claims" has the meaning set forth in Section 12.15.

"Sale Hearing" means the hearing to consider the entry of the Bankruptcy Sale Order.

"Schedules" has the meaning set forth in Section 6.3(a).

"Seller" has the meaning set forth in the Preamble.

"Seller's Knowledge" means the actual (and not constructive or imputed) knowledge of S. Jay Lawrence, the Chairman, Chief Executive Officer, and President of the Seller.

"Software" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form,

virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"Subsidiary" means any Person whose securities or other ownership interests having by their terms the power to elect a majority of the board of directors or other persons performing similar functions are owned or controlled, directly or indirectly, by Seller, or which is owned 50% or more, directly or indirectly, by Seller.

"Tax" or "Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Transaction Taxes" has the meaning set forth in Section 7.1.

"Transferred Employees" has the meaning set forth in Section 6.4(a).

1.2     Interpretation.

When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a) Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b) The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c) The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d) A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(e) A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefore and all regulations and statutory instruments issued thereunder or pursuant thereto.

(f) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g) Any reference in this Agreement to $ shall mean U.S. dollars.

(h) The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

2.1    Purchase and Sale of Assets.

Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in, to and under the Acquired Assets as is and where is, free and clear of all pledges, security interests, Liens, Claims, Interests or Encumbrances (other than Permitted Liens). Purchaser shall be entitled to assign all or a portion of its rights under this Agreement to one or more Affiliates. "Acquired Assets" shall mean all of the direct or indirect, right, title and interest of Seller in and to the tangible and intangible assets, properties, rights, claims and Contracts related to the Business (but excluding Excluded Assets) as of the Closing, including but not limited to:

(a) all Cash;

(b) all accounts receivable, rebates, refunds and other receivables of Seller;

(c) all Inventories;

(d) all deposits, prepaid expenses, deferred revenue, or advance payments, including customer deposits and pre-paid support obligations, relating to any Acquired Assets.

(e) all rights of Seller under each lease and any related agreement for the Leased Property, in each case together with Seller's interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and Seller's rights in respect thereof;

(f) all FF&E;

(g) all Intellectual Property;

(h) all Assigned Contracts;

(i) all Documents;

(j) all Permits;

(k) all rights under or arising out of all insurance policies relating to the Business or the Acquired Assets, unless non-assignable as a matter of law;

(l) all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties, including non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction;

(m) any rights, claims or causes of action of Seller for claims arising out of the operation of the Business;

(n) all rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to Seller or to the extent affecting any Acquired Assets other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(o) all causes of action arising under Chapter 5 of the Bankruptcy Code relating to the Business and Acquired Assets, including (i) any actions against or otherwise involving any counterparty to any Assigned Contract, any post-Closing employees, officers or directors of the Business including Transferred Employees, and/or any of the Seller's lenders, landlords or vendors and/or (ii) relating to the ongoing or future operations of the Business; and

(p) all goodwill and other intangible assets associated with the Business and the Acquired Assets, including customer and supplier lists.

2.2     Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded

11

Assets. For all purposes of and under this Agreement, and as the same may be amended pursuant to Section 2.5, the term "Excluded Assets" includes:

(a) any and all rights of the Seller under this Agreement;

(b) the Purchase Price payable to Seller under this Agreement;

(c) all rights and interests in connection with, and assets of, any Employee Benefit Plan;

(d) the capital stock of Seller;

(e) the assets listed on Schedule 2.2(e);

(f) the Carve-Out;

(g) all rights under or arising out of insurance policies not relating to the Business or the Acquired Assets or non-assignable as a matter of law;

(h) all tax attributes of Seller, provided that any tax refunds remain subject to security interests of the lenders under the Pre-Petition Agreements and the DIP Facility; and

(i) all Contracts that are not Assigned Contracts.

2.3     Assumption of Liabilities.

Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge the following liabilities and obligations (the "Assumed Liabilities"):

(a) all Cure Amounts due and owing under any Assigned Contracts;

(b) all of Seller's liabilities and obligations under the Assigned Contracts accruing after the Closing;

(c) all ordinary course liabilities and obligations with respect to the Acquired Assets arising after the Closing Date; and

(d) those specific liabilities and obligations of Seller identified on Schedule 2.3(e) hereto, provided, however, that such liabilities and obligations of Seller identified on Schedule 2.3(e), shall only be paid by Purchaser to the extent not satisfied by the Agreed Budget.

2.4     Excluded Liabilities.

Purchaser shall not assume or be liable for any Claims, Liens, Encumbrances or Interests or any other liabilities and obligations of Seller of any nature whatsoever, whether presently in existence or arising hereafter other than the Assumed Liabilities (the "Excluded Liabilities"). For the avoidance of doubt, Purchaser shall not assume or be liable for any liabilities and obligations that are the subject of litigation or arbitration as of the Closing Date, or that arose

prior to the Closing Date and are asserted thereafter, including any such liabilities or obligations that otherwise would be Assumed Liabilities.

2.5    Assignment and Assumption of Contracts.

(a) At Closing, Seller shall, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), the Assignable Contracts that are set forth on Schedule 2.5(a) (identifying the name, parties and date of each such Assignable Contract) provided by Purchaser to Seller on the date hereof and as supplemented on or before the date that is three (3) days prior to the date set for the Auction (provided that Seller provides written notice to Purchaser of the date of the Auction at least seven (7) days prior to the date on which the Auction is to begin) (the "Assigned Contracts"); provided, however, that Purchaser shall have the right in its sole and absolute discretion to notify the Seller in writing of any Assigned Contract that it does not wish to assume immediately prior to the commencement of the Sale Hearing. Purchaser shall pay all Cure Amounts in connection with such assumption and sale and assignment (as agreed to between Purchaser and Seller or as determined by the Bankruptcy Court), and Purchaser shall assume and agree to perform and discharge the Assumed Liabilities under the Assigned Contracts, pursuant to the Assignment and Assumption Agreement; provided, however, that on the date hereof, as supplemented on or before the date that is seven (7) days prior to the date set for the Auction, Seller shall provide to Purchaser (i) a schedule of the Cure Amounts (the "Cure Schedule") for the Assigned Contracts and (ii) a schedule setting forth a detailed description of all such Contracts listed on Schedule 4.6(a), and each other Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets. Purchaser shall not be required to pay any obligation on the part of the Seller in excess of the amounts listed on the Cure Schedule, provided that Purchaser shall pay any Cure Amounts relating to a default on any Assignable Contracts occurring after Closing which default is not the result of Seller's breach of the Agreement. From and after the date hereof, Seller shall not reject any Assigned Contract unless otherwise agreed to in writing by Purchaser. Seller shall provide timely and proper written notice of the motion seeking entry of the Bankruptcy Sale Order to all parties to Assigned Contracts and take all other actions necessary to cause such Assigned Contracts to be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 necessary to assign to Purchaser the Assigned Contracts. Purchaser and Seller agree that there shall be excluded from the Acquired Assets any Assigned Contracts that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing, and the Closing shall proceed with respect to the remaining Acquired Assets without reduction to the Purchase Price, subject to Purchaser's termination right set forth in Section 6.6.

# ARTICLE 3
## CONSIDERATION

3.1   <u>Purchase Price.</u>

        (a)     Seller hereby acknowledges, confirms and agrees that (i) it will incur indebtedness under the DIP Facility to be provided by the DIP Lenders; (ii) as of the close of business on September 1, 2009, Seller was indebted to the Pre-Petition Lenders under the Pre-Petition Agreements in the aggregate principal amount set forth in <u>Schedule 3.1</u> (the "Principal Amount") together with interest accrued on the Principal Amount, and fees, costs, expenses and other charges payable by the Seller to the Pre-Petition Lenders, including legal and consultant fees and expenses through the Closing (collectively with the Principal Amount and the amount to be owed under the DIP Facility, the "Lenders Debt"); (iii) the Pre-Petition Lenders have and shall continue to have valid, enforceable and perfected first-priority liens upon and security interests in the Acquired Assets granted to the Pre-Petition Lenders in connection with the Pre-Petition Agreements, and to the DIP Lenders in connection with the DIP Facility and DIP Orders; and (iv) the Lenders Debt is a valid and unconditional obligation of Seller to the Pre-Petition Lenders and is due and owing without offset, defense or counterclaim of any kind, nature or description whatsoever and the Seller hereby expressly waives any and all rights to contest and/or challenge in any manner whatsoever the Pre-Petition Lenders' perfected first-priority liens upon and security interests in the Acquired Assets.

        (b)     Subject to the right (but not obligation) to overbid at the Auction in consideration of the sale of the Business and Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions hereinafter set forth, the purchase price (the "Purchase Price") for the Business and Acquired Assets shall be:

        (i)     $6,096,579.42 (the "Credit Bid Amount"), which shall be satisfied in the form of a credit against the Obligations and Seller's obligations under the Pre-Petition Agreements and DIP Facility in accordance with <u>Section 3.1(c)</u>, plus

        (ii)     assumption of the Assumed Liabilities; and

        (iii)     a cash payment required to pay the Cure Amounts.

        (c) At the Closing, the Purchase Price shall be payable,

        (i)     with respect to the Credit Bid Amount, by Purchaser canceling that portion of the Lenders Debt in an amount equal to the Credit Bid Amount; and

        (ii)     with respect to the Cure Amounts in cash.

3.2   <u>Allocation of Purchase Price.</u>

        (a) Within the earlier of (i) 60 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Purchaser shall deliver to Seller a statement (the "Allocation Statement") allocating, for tax purposes, the

14

consideration paid by Purchaser for the Acquired Assets among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder. Seller and Purchaser shall cooperate in the filing of any forms (including Form 8594) with respect to such allocation.

(b) The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any corresponding other Tax forms) and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller transfers the Acquired Assets to the Purchaser as is and where is and makes no representations or warranties to the Purchaser as of the date hereof and as of the Closing Date except for the following:

4.1    Corporate Organization.

Seller is duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which the Business is currently being conducted. Seller is qualified to do business and is in good standing in all jurisdictions where it leases real property in connection with the operation of the Business or otherwise conducts the Business, except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

4.2    No Subsidiaries.

Seller has no subsidiaries or equity investments in any other corporation, association, partnership, joint venture or other entity that carries on the business of Seller. GigaBeam Service Corporation, a Delaware corporation, was legally dissolved effective September 2, 2009 and has no creditors.

4.3    Authorization of Agreement.

Subject to entry of the Bankruptcy Sale Order and each authorization as is required by the Bankruptcy Court:

(a) Seller has, or at the time of execution will have, all necessary corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement to which it is or will become a party and to perform its obligations hereunder and thereunder;

(b) the execution, delivery and performance of this Agreement and each Ancillary Agreement to which Seller is or will become a party and the consummation of the transactions contemplated hereby and thereby have been, or at the time of execution will be, duly authorized

by all necessary corporate action on the part of Seller and no other corporate proceedings (shareholder or otherwise) on the part of Seller are necessary to authorize such execution, delivery and performance; and

(c) this Agreement and each Ancillary Agreement to which Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each Ancillary Agreement to which Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

4.4 <u>Conflicts; Consents of Third Parties.</u>

(a) Except as set forth on <u>Schedule 4.4(a)</u>, the execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement, the consummation of the transaction contemplated hereby and thereby, or compliance by Seller with any of the provisions hereof do not, or will not at the time of execution, result in the creation of any Lien upon the Acquired Assets and do not, or will not at the time of execution, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i) Seller's certificate of incorporation, by-laws;

(ii) subject to entry of the Bankruptcy Sale Order, any Assigned Contract or Permit to which Seller is a party or by which any of the Acquired Assets are bound;

(iii) subject to entry of the Bankruptcy Sale Order and Seller's Knowledge, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller or any of the properties or assets of Seller as of the date hereof; or

(iv) subject to entry of the Bankruptcy Sale Order and Seller's Knowledge, any applicable Law.

(b) Subject to entry of the Bankruptcy Sale Order, except as set forth on <u>Schedule 4.4(b)</u> and to Seller's Knowledge, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is or will become a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets.

4.5 <u>Title to Acquired Assets.</u>

The Seller is the owner of the Acquired Assets existing as of the date hereof. Seller has good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens,

Claims, Interests and Encumbrances, other than any permitted exceptions set forth on Schedule 4.5 hereto (the "Permitted Exceptions") and Permitted Liens, and Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances. Except as set forth in Schedule 4.5, all FF&E and other tangible assets comprising the Acquired Assets are in good operating condition (normal wear and tear excepted other than with respect to Inventory) and are fit in all material respects for use in the ordinary course of business.

4.6     Contracts.

(a) Schedule 4.6(a) sets forth a list, as of the date hereof, to the best of the Seller's Knowledge, all material Contracts to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets. To the extent written, Purchaser has received, or will receive by the Closing Date, true and complete copies of such material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement. Except as set forth on Schedule 4.6(a), each material Contract is a valid and binding agreement of Seller and is in full force and effect, Seller is not, and to Seller's Knowledge no other party thereto is, in default or breach, and to Seller's Knowledge, no event or condition has occurred which after notice or with the lapse of time or both would constitute a default or breach, in any respect under the terms of any material Contract. Seller has not received any written notice of the intention of any party to terminate any material Contract or that any party considers Seller to be in material breach or material default thereunder or in potential breach in a material respect or default thereunder

(b) Schedule 2.5(a) sets forth a complete and accurate list of the Assigned Contracts that will be assigned to Purchaser on the Closing Date. Each Assigned Contract (i) is in full force and effect and is binding upon and enforceable against Seller, and, to Seller's Knowledge, all other parties thereto in accordance with its terms, (ii) has not been materially amended or otherwise materially modified by Seller except as specified in such Schedule 4.6(b) and (iii) is not in material default due to the action of Seller or, to Seller's Knowledge, any other party thereto. Seller has not received written notice that any party to any Assigned Contract intends to cancel or terminate such Assigned Contract, and Seller is not aware of any pending, or to Seller's Knowledge, threatened dispute or other information that would reasonably be expected to result in any party to any Assigned Contract canceling or terminating such Assigned Contract.

(c) The Cure Amounts set forth on the Cure Schedule with respect to the Assigned Contracts are true and correct in all material respects. No monetary defaults exist under any Assigned Contracts other than the monetary defaults required to be cured pursuant to Section 365 of the Bankruptcy Code and listed on the Cure Schedule. To Seller's Knowledge, no non-monetary defaults exist under any Assigned Contract other than the non-monetary defaults listed on Schedule 4.6(c).

785415-6

4.7    Property.

Seller does not own any real property.  Purchaser has received true and complete copies of the leases, ground leases, subleases and licenses and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement relating to the Leased Property.  Upon Purchaser's acquisition of the Acquired Assets, Purchaser will be able to operate the Leased Property in substantially the same manner as operated by the Seller without violating any applicable zoning, use, subdivision or similar law.

4.8    Intellectual Property.

(a) Except as set forth on Schedule 4.8(a), (i) with respect to any Intellectual Property owned by Seller (as opposed to Intellectual Property of which Seller is a licensee), Seller has all right, title and interest to all Intellectual Property, without any conflict known to Seller with the rights of others, (ii) no Person other than Seller has the right to use the Intellectual Property owned by Seller, and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in the Business that is owned by a party other than Seller.

(b) To the Seller's Knowledge, set forth on Schedule 4.8(b)(i) are all items of Intellectual Property used or useful in connection with or related to the Business.  Except as set forth on Schedule 4.8(b)(ii), the Seller has not granted any sublicense or similar right with respect to the Intellectual Property.

(c) With respect to each item that is required to be identified on Schedule 4.8(b)(i) and except as otherwise set forth on Schedule 4.8(a), (i) at the Closing, to the Seller's Knowledge, Purchaser shall hold sole and exclusive rights to all such Intellectual Property, and no other person shall have existing or contingent rights to use such Intellectual Property except with respect to software that is licensed from unaffiliated third persons; (ii) the Seller owns or possesses sufficient rights in or to such item to assign to Purchaser all rights of the Seller in such Intellectual Property and (iii) no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to the Seller's Knowledge, is threatened, as of the date hereof, that challenges the legality, validity, enforceability, registrations, use, or ownership of the item.

4.9    Permits.

Schedule 4.9 sets forth a list of all Permits held by Seller. The Seller possesses all material Permits necessary for the operation of the Business as currently conducted and the ownership of the Acquired Assets.

4.10    Employee Benefit Plans.

Schedule 4.10 sets forth a list of each Employee Benefit Plan.  Neither Seller nor any ERISA Affiliate has maintained, sponsored, or contributed to an Employee Benefit Plan that is subject to Title IV of ERISA within the last six years or, in any way, directly or indirectly, has any liability with respect to such a plan.  All Employee Benefit Plans are being administered in compliance, in all material respects, with, where applicable, ERISA and the Code, and the

regulations promulgated thereunder. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter upon which Seller may rely, or has pending or has time remaining in which to file an application for such determination from the United States Internal Revenue Service.

4.11    Labor Relations.

(a) Except as set forth on Schedule 4.11 (a), Seller is not a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization. Seller has received no written notice of any outstanding representation petitions involving Seller before the National Labor Relations Board or any state labor board and, to Seller's Knowledge, no such petition has been threatened, and no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing.

(b) Schedule 4.11(b) contains a list of all individuals, whether or not actively at work as of the date hereof, who are employed by the Seller in connection with the Business and (i) their titles or positions; (ii) their dates of hire; (iii) their current salaries or wages and all bonuses, commissions and incentives paid at any time during the past twelve months; (iv) their last compensation changes and the dates on which such changes were made; (v) any non-standard bonus, commission or incentive plans or agreements for or with them; (vi) any outstanding loans or advances made by or to them; and (vii) lists any verbal or written employment agreements which impacts or establishes the terms of employment of those persons. Schedule 4.11(b) is accurate and complete as of the date indicated thereon (which date is the most recent date for which the information contained thereon is readily available to the Seller). Correct and complete copies of all such written employment agreements have been delivered to Purchaser.

(c) Seller is not subject to any material unfair labor practice charge. The Seller is in compliance, in all material respects, with all Laws relating to employment practices. The Seller has delivered to Purchaser accurate and complete copies of all current employee manuals and handbooks, disclosure materials, policy statements and other materials prepared, disclosed or promulgated by the Seller at any time during the last three years relating to the employment of the current and former employees of the Seller

(d) Seller has not terminated, nor has any intention to terminate, the employment of any key employee listed on Schedule 4.11(d) nor is Seller aware that any key employee listed on Schedule 4.11(d) intends to terminate his or her employment with Seller through the Closing Date.

4.12    Environmental Matters.

To Seller's Knowledge, (a) the Acquired Assets are in material compliance with all applicable Laws, regulations, or other legal requirements relating to the protection of the environment or human health and safety as it relates to Hazardous Materials ("Environmental Laws"), (b) Seller has not received written notice of any investigation, suit, claim, action, or proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor are any of the same being threatened in writing against Seller or any real

property leased by Seller, (c) Seller has not received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws and (d) there has been no release of any Hazardous Material into the environment at, onto, or from any property leased by Seller that would reasonably be expected to result in material liability, costs or Claims relating to any Environmental Law. The Seller has obtained and maintains all permits, licenses and other authorizations required under all applicable Environmental Laws to operate the Business as it is currently being operated at the real property leased by Seller, and all such permits, licenses and authorizations are in full force and effect.

4.13    Insurance.

Seller maintains the insurance policies set forth on Schedule 4.13, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect and to the Seller's Knowledge, except as set forth on Schedule 4.13, will continue in full force and effect immediately following the Closing. Seller has paid all premiums on such policies due and payable prior to the Execution Date. To Seller's Knowledge, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

4.14    No Brokers or Finders.

No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, other than as set forth on Schedule 4.14, the fees and expenses of which Seller shall bear, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.15    Litigation; Proceedings.

Except for the Bankruptcy Cases or as set forth in Schedule 4.15, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Seller's Knowledge, threatened against or related to the Business or Seller in respect of the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Seller's Knowledge, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any settlement agreement with any Person.

4.16    Customers and Suppliers.

Schedule 4.16 sets forth a complete and correct list of the twenty largest customers and the twenty largest suppliers (each measured by dollar volume of sales and purchases as the case may be) of the Business as of and for each of the last two (2) calendar years, and the amount of such business done (by dollar volume of sales and purchases as the case may be) with each such customer or supplier as of and for each such year. The Seller has not received any notice from

any such customer or supplier that such customer or supplier has ceased, or will cease, to purchase or sell, as applicable, products or services to or from the Seller or will or intends to substantially reduce such purchases or sales, as applicable

4.17 <u>Taxes.</u>

(a) Except as set forth on <u>Schedule 4.17,</u> (i) Seller has timely filed with the appropriate taxing authorities all tax returns required to be filed by it with respect to the Acquired Assets and the income and operations of the Business and has paid on a timely basis all Taxes due and payable by it as set forth on such returns; (ii) the information on such tax returns is complete and accurate in all material respects; (iii) Seller has provided copies of all such tax returns to Purchaser; and (iv) as of the Closing Date, there will be no Encumbrances for Taxes (other than for current Taxes not yet due and payable) upon the Acquired Assets.

(b) There is no audit or other matter in controversy with respect to any Taxes due and owing by any of the Seller insofar as any such matter pertains to the Acquired Assets or the income and operations of the Business, and there is no Tax deficiency or claim assessed or, to the Seller's Knowledge, proposed or threatened (whether orally or in writing) against the Seller, insofar as any such deficiency or claim pertains to the Acquired Assets or the income and operations of the Business.

(c) Except as set forth on <u>Schedule 4.17,</u> Seller has, in all material respects, withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other third party.

(d) Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

4.18 <u>Board Approval and Recommendations.</u>

The Board of Directors of Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement, the Bidding Procedures Order and the Bankruptcy Sale Order regarding the solicitation of and the ability to accept Alternative Transactions, a sale, assignment and assumption of the Acquired Assets and Assumed Liabilities pursuant to this Agreement under sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of Seller.

4.19 <u>Compliance with Laws.</u>

Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws in all material respects, and (ii) holds all material Permits, concessions, grants, licenses, easements, variances, exemptions, consents, orders, franchises, authorizations and approvals of all Governmental Authorities necessary for the lawful conduct of the Business. Seller has not received any written notice or other written communication from any Governmental Entity or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Permit or (ii) notifying Seller of the non-renewal, revocation or withdrawal of any Permit. Seller is in material compliance with the terms of the Permits.

4.20    No Alternative Transactions.

Other than this Agreement and each of the Ancillary Agreements, Seller is not a party to or bound by any agreement with respect to a possible Alternative Transaction or other sale, transfer or disposition of any of the Acquired Assets.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

5.1    Corporate Organization.

Purchaser is a limited company duly organized, validly existing and in good standing under the Laws of Bermuda and has all requisite power and authority to own its properties and assets and to conduct its business as now conducted.

5.2    Authorization and Validity.

Purchaser has, or at the time of execution will have, all necessary corporate power and authority to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder have been, or at the time of execution will be, duly authorized by all necessary action by the investment manager of Purchaser, and no other limited company proceedings on the part of Purchaser is necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and constitute, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy or other Laws affecting creditors' rights and by equitable principles.

5.3    No Conflict or Violation.

The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is a party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject.

5.4    No Broker or Finder.

No broker, finder or financial advisor has been engaged by Purchaser in connection with the transactions contemplated by this Agreement.

22

## ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

6.1     Pre-Closing Covenants of Seller.

Seller covenants with Purchaser that, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a) Cooperation.  Seller shall, without payment of funds to counterparties, use commercially reasonable efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the Closing), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Seller shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.  Prior to the Closing, the Seller shall take any and all necessary actions to transfer, assign, record or perfect in its name record title to any of its Acquired Assets that is not presently held or recorded in its name, including, without limitation, filing any necessary notices of assignment in the United States Patent and Trademark Office or United States Copyright Office, as applicable, with respect to the Intellectual Property.

(b) Access to Records and Properties.  Seller agrees, prior to the Closing Date, (i) that Purchaser and its Related Persons shall be entitled to reasonable access upon reasonable notice to the facilities, offices and personnel of Seller and to the books and records of Seller, related to the Business or the Acquired Assets or otherwise reasonably requested by Purchaser, including access to perform field examinations and inspections of the Inventory and FF&E of the Business; (ii) to furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations of Seller as Purchaser shall reasonably request; and (iii) to permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, that Purchaser shall use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any employee of Seller. Purchaser agrees not to contact any customer or supplier of the Seller with respect to this Agreement without prior notice to the Seller.  The Seller shall cooperate with Purchaser to facilitate such contact and discussions between Purchaser and such employees, customers and suppliers.  Promptly following the date of this Agreement, the Seller shall provide Purchaser with contact information for each customer and supplier identified on Schedule 4.16.

(c) Conduct of Business Prior to Closing.  Except as expressly contemplated by this Agreement, and except to the extent expressly required under the DIP Facility, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court:

(i)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not take any action that would constitute or result in an Event of Default (as defined therein) under the DIP Facility;

(ii)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Acquired Assets other than the sale of Inventory in the ordinary course of business or the use of cash collateral in accordance with the DIP Facility or the DIP Orders;

(iii)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Exceptions and Permitted Liens and Liens granted in connection with the DIP Facility;

(iv)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Seller in this Agreement;

(v)     Seller shall notify Purchaser promptly in writing of any Material Adverse Effect;

(vi)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not make any promise or representation, oral or written, or otherwise, (x) to increase the annual level of compensation payable or to become payable by Seller to any of their directors or Business Employees, (y) to grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Business Employee, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) to hire any new individuals or enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller is a party or involving a director or Business Employee of Seller, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Execution Date and disclosed on Schedule 4.10;

(vii)     Seller shall (x) comply in all material respects with all Laws applicable to its or having jurisdiction over the Business or any Acquired Asset, (y) maintain all existing Permits applicable to the Business, and (z) pay all applicable Taxes as approved by the Bankruptcy Court;

(viii)     without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any Contract material to Seller to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets, or assume, amend, modify, terminate, or release or assign any material rights or claims under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets (including any Assigned Contract);

(ix)    without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not cancel or compromise any material debt or claim or waive or release any right of Seller that constitutes an Acquired Asset;

(x)    without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not enter into any commitment for capital expenditures except pursuant to any budget approved by the lenders under the DIP Facility;

(xi)    without Purchaser's prior written consent (which consent may be delivered via electronic mail and may be withheld for any reason or no reason at all), Seller shall not terminate, amend or modify in any manner any lease for Leased Property;

(xii)    Seller shall use commercially reasonable efforts to (1) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the ordinary course, (2) preserve the existing business organization and management of the Business intact, (3) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (4) maintain existing relations with customers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, and (5) refrain from changing in any material respect any of its product prices or pricing policies (e.g., discount policies) for any of their products, except as shall be necessary to meet competition or customer requirements;

(xiii)    Seller shall at all times maintain, preserve and protect all of its material Intellectual Property, and preserve all the remainder of its material property, in use or useful in the conduct of the Business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times; and

(xiv)    Seller shall not take, or agree, commit or offer (in writing or otherwise) to take, any actions in violation of the foregoing.

6.2    Pre-Closing Covenants of Purchaser.

Purchaser covenants with Seller that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

(a) Cooperation.  Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; provided, that the foregoing shall not require Purchaser to participate in the Auction.

(b) Adequate Assurances Regarding Assigned Contracts and Required Orders. With respect to each Assigned Contract, Purchaser shall provide adequate assurance of the future

performance of such Assigned Contract by Purchaser. Purchaser shall take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of the Bankruptcy Sale Order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c) Sufficient Funds. Purchaser shall ensure that, on the Closing Date, it will have sufficient funds to pay Cure Amounts respecting the Assigned Contracts and all of its fees and expenses incurred in connection with the transactions contemplated hereby.

(d) Permits. Purchaser shall use commercially reasonable efforts to cooperate with Seller to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Acquired Assets under applicable Laws.

6.3 Other Covenants of Seller and Purchaser.

(a) Disclosure Schedules and Supplements. Seller, on the one hand, shall notify Purchaser of, and Purchaser on the other hand, shall notify Seller of, and shall supplement or amend the disclosure schedules (the "Schedules") to this Agreement with respect to, any matter that (i) arises after the Execution Date and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Seller or Purchaser, as applicable, that has been rendered inaccurate thereby. Each such notification and supplementation, to the extent known, shall be made no later than two (2) Business Days after discovery thereof and no later than three (3) days before the date set for the Closing by the parties. No such supplement or amendment to the Schedules to this Agreement shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

(b) Personally Identifiable Information. Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of the Seller in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

(c) Access to Records after Closing. Following Closing, Purchaser and Seller agree to permit their respective representatives to have access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business operations, to the books and records acquired pursuant to this Agreement so as to enable Purchaser and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal actions or for other like purposes. If either party desires to dispose of any such records, such party shall, prior to such disposition, provide the other party with a reasonable opportunity to remove such of the records to be disposed of at the removing party's expense.

6.4 Employment Covenants and Other Undertakings.

(a) Employees. Purchaser shall have the right, but not the obligation, to employ or engage as contractors any or all of the Business Employees as Purchaser determines in its sole

and absolute discretion. The terms of employment offered to any Business Employees shall be determined by Purchaser in its sole and absolute discretion. Any Business Employees actually employed by Purchaser are referred to herein as "Transferred Employees." Purchaser shall deliver a list of the Business Employees it intends to hire no later than five (5) days prior to the hearing to approve the Bankruptcy Sale Order. Seller shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Transferred Employees (including completed I-9 forms and attachments with respect to all Transferred Employees, except for such employees as Seller certifies in writing are exempt from such requirement).

(b) <u>Purchaser Employee Benefit Plans</u>. At Closing, Purchaser shall provide, or shall cause to be provided, for the benefit of the Transferred Employees and their beneficiaries and dependents, employee welfare benefits plans as defined in Section 3(1) of ERISA that are no less favorable than those provided to the Transferred Employees, their beneficiaries and dependents, immediately prior to Closing. For all purposes under such employee welfare benefits plans of the Purchaser, whether now existing or hereafter adopted ("Purchaser Plans"), Purchaser shall credit (i) each Transferred Employee with his or her service with the Seller, to the same extent such service would have been credited had such service been with Purchaser, and (ii) the Transferred Employees with all service recognized by Seller under employee plans as service with Purchaser for purposes of eligibility to participate and vesting under all employee benefit plans, programs and policies of Purchaser. The Purchaser shall waive any coverage waiting period, pre-existing condition and actively-at-work requirements that have been satisfied under corresponding plans of Seller and shall provide that any eligible expenses incurred before the Closing Date by a Transferred Employee (and his or her beneficiaries or dependents) or Seller during the calendar year of the Closing and disclosed to Purchaser by such Transferred Employee shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions, and applicable annual and/or lifetime maximum benefit limitations of Purchaser Plans.

(c) <u>Seller Employee Benefit Plans</u>. Unless the Purchaser, in its sole discretion, elects on or after the Closing, to adopt any of the Seller's Employee Benefit Plans, Seller shall retain (i) all liabilities and obligations in respect of its past, present and future employees under applicable Laws and (ii) all liabilities and obligations under any "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other employee benefit plan or program maintained or contributed to by a Seller or any ERISA Affiliate, including any Employee Benefit Plans, and Purchaser shall have no liability or obligation whatsoever under the Employee Benefit Plans nor shall Purchaser assume the sponsorship of the Employee Benefit Plans.

(d) <u>Other Obligations</u>. Except as otherwise required by Law, specified in this Agreement, or otherwise agreed in writing by Purchaser and/or its Affiliates, neither Purchaser nor its Affiliates shall be obligated to provide any severance, separation pay, or other payments or benefits, including any key employee retention payments, to any employee of Seller on account of any termination of such employee's employment on or before the Closing Date, and such benefits (if any) shall remain obligations of the Seller.

(e) <u>Forms W-2 and W-4</u>. Seller and Purchaser shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Transferred Employees. Under

this procedure, Seller shall keep on file all IRS Forms W-4 provided by the Transferred Employees for the period required by applicable law concerning record retention and Purchaser shall obtain new IRS Forms W-4 with respect to each Transferred Employee.

(f) Employee Communications.  Prior to making any written or oral communications to the Business Employees pertaining to compensation or benefit matters that are affected by the transactions contemplated by this Agreement, Seller shall provide Purchaser with a copy of the intended communication.

6.5     Non-Assignment of Contracts.

Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Assigned Contract or any Permit, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of any other Person party thereto, would constitute a breach thereof or in any way negatively affect the rights of Purchaser (unless the restrictions on assignment would be rendered ineffective pursuant to sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended), as the assignee of such Assigned Contract or Permit, as the case may be, thereunder. If, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, neither Seller nor Purchaser shall be in breach of this Agreement nor shall the Purchase Price be adjusted or the Closing delayed, provided that Seller shall cooperate with Purchaser without further consideration, in any reasonable arrangement designed to provide Purchaser with all of the benefits of or under any such Assigned Contract or Permit, including but not limited to enforcement for the benefit of Purchaser of any and all rights of Seller against any Person party to the Assigned Contract or Permit arising out of the breach or cancellation thereof by such Person; provided, however, that after Closing, Purchaser shall be responsible for all payment and other obligations under, and for all costs of enforcing rights under, such Assigned Contract or Permit to the same extent as if such Assigned Contract or Permit had been assigned.  Any assignment to Purchaser of any Assigned Contract or Permit that shall, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.  For the avoidance of doubt, nothing in this Section 6.5 shall be deemed to alter any rights of the Purchaser under Section 11.1(c)(ix) of this Agreement.

6.6     Casualty.

If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Purchaser shall have the option to:  (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

785415-6

6.7     Name Change.

At Closing, Seller shall deliver to Purchaser a duly and properly authorized and executed evidence (in form and substance satisfactory to Purchaser) as to the amendment of Seller's certificate of incorporation (the "Organizational Amendment") changing Seller's name to another name that does not include either of the following words "GigaBeam" and "WiFiber." Upon the Closing Date, Seller shall obtain authority from the Bankruptcy Court to change the name of the case caption to reflect the foregoing name change. Upon the Closing, Seller hereby irrevocably authorizes Purchaser to file the Organizational Amendment with the Secretary of State of the State of Delaware and in each State in which Seller is qualified to do business on Seller's behalf. Furthermore, after the Closing, Seller shall discontinue the use of its current name (and any other tradenames currently utilized by Seller) and shall not subsequently change its name to or otherwise use or employ any name that includes the words "GigaBeam" and "WiFiber" without the prior written consent of Purchaser. From and after the Closing, Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, dba's or similar Intellectual Property rights utilized by Seller in the conduct of the Business, which rights are included in the Acquired Assets purchased hereunder.

## ARTICLE 7
## TAXES

7.1     Taxes Related to Purchase of Acquired Assets.

(a) All Taxes, including all state and local Taxes in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "Transaction Taxes"), that are imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets shall be borne solely by Seller. Purchaser and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

(b) To the extent permitted by applicable Law, all Taxes relating to the Acquired Assets which have accrued and become payable prior to the Closing Date shall be paid by Seller. All Taxes that accrue and become payable subsequent to the Closing Date shall be paid by Purchaser. All Taxes in respect of a period that commences prior to the Closing Date and ends subsequent to the Closing Date shall be prorated between and paid by Seller and Purchaser based upon the number of days in each such portion of such period. The amount due any party as a result of proration shall be paid to such party at the Closing.

7.2     Cooperation.

Purchaser and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer

of any governmental or regulatory inquiry relating to Tax matters. Purchaser agrees to retain possession of all Tax files, books and records delivered to Purchaser by Seller for a period of at least three (3) years from the Closing Date. If Purchaser determines to destroy or discard any of such files, books or records after the end of such three-year period, Purchaser will give Seller reasonable notice thereof and will allow Seller to take possession of such files, books and records at Seller's expense. From and after the Closing Date, Purchaser agrees that it will provide reasonable access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to such files, books and records as Seller may reasonably deem necessary to prepare for, file, prove, answer, prosecute or defend any claim, suit, inquiry or other proceeding, related to Taxes in connection with the Acquired Assets and the Business.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

### 8.1    Motions.

Seller shall file with the Bankruptcy Court, within one (1) Business Day after the Petition Date, a motion or motions (the "Motion") seeking the Bankruptcy Court's approval of the Bidding Procedures Order and the Bankruptcy Sale Order, in form and substance reasonably satisfactory to Purchaser. Seller shall affix a true and complete copy of this Agreement to the Motion filed with the Bankruptcy Court. The Motion shall request, among other things, pursuant to, inter alia, Bankruptcy Code Sections 105, 365(b), (f), (k), (m) and (n), 365 and Bankruptcy Rules 2002, 6004, 6006 and 9014 (i) the scheduling of the date for the Auction to be commenced no later than October 28, 2009, and the Sale Hearing not more than one (1) Business Day following the completion of the Auction, (ii) the entry of the Bidding Procedures Order in all material respects on the terms set forth in Exhibit B by no later than September 15, 2009 and (iii) the entry of the Bankruptcy Sale Order in all material respects on the terms set forth in Exhibit A by no later than October 29, 2009.

### 8.2    Assigned Contracts.

Seller shall serve on all counterparties to those Contracts that may be designated as Assigned Contracts pursuant to Section 2.5(a) a notice specifically stating that Seller is or may be seeking the assumption and assignment of the Assigned Contracts and shall notify such parties of the deadline for objecting to the Cure Amounts, which deadline shall not be less than five (5) days prior to the Auction. In cases in which the Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00. The Motion shall reflect Purchaser's agreement to perform from and after the Closing under the Assigned Contracts, which, subject to Court approval shall be the only adequate assurance of future performance necessary to satisfy the requirements of section 365 of the Bankruptcy Code in respect of the assignment to Purchaser of such Assigned Contracts.

### 8.3    Procedure.

To the extent practicable under the circumstances, Seller shall provide Purchaser with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with

this Agreement for Purchaser's prior review and comment and shall cooperate with Purchaser to make reasonable changes. Seller agrees to diligently prosecute the entry of the Bankruptcy Sale Order. In the event the entry of the Bankruptcy Sale Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal. Notwithstanding the foregoing, any resulting material changes to this Agreement or any Ancillary Agreement or any resulting material changes to the Orders shall be subject to Purchaser's approval in its sole discretion, and any resulting non-material changes to the Agreement, Ancillary Agreements or Orders shall be subject to Purchaser's approval in its reasonable discretion.

## ARTICLE 9
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

9.1 <u>Conditions Precedent to Performance by Seller.</u>

The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the condition contained in <u>Section 9.1(c)</u>) may be waived by Seller, in its sole discretion:

(a) <u>Representations and Warranties of Purchaser.</u> The representations and warranties of Purchaser made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and the representations and warranties of Purchaser made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and Seller shall have received a certificate signed by an authorized officer of the Purchaser on behalf of the Purchaser, dated as of the Closing Date, to the foregoing effect.

(b) <u>Performance of the Obligations of Purchaser.</u> Purchaser shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party that are to be performed by it on or before the Closing Date (except with respect to (i) the obligation to pay the Purchase Price in accordance with the terms of this Agreement and (ii) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), and Seller shall have received a certificate signed by an authorized officer of the Purchaser on behalf of the Purchaser, dated as of the Closing Date, to the foregoing effect.

(c) <u>Bankruptcy Court Approval.</u> The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay.

(d) <u>No Violation of Orders.</u> No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e) <u>Bidding Procedures Order.</u> On or prior to September 15, 2009, the Bidding Procedures Order shall have been entered in the Bankruptcy Cases.

(f) Bankruptcy Sale Order. On or prior to October 29, 2009, the Bankruptcy Sale Order shall have been entered in the Bankruptcy Cases.

(g) Assumption, Sale and Assignment of Contracts. Subject to Section 6.5, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court.

9.2     Conditions Precedent to the Performance by Purchaser.

The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(e) and Section 9.2(g), except as expressly provided therein) may be waived by Purchaser, in its sole discretion:

(a) Representations and Warranties of Seller. The representations and warranties of Seller made in this Agreement that are qualified by a materiality standard, in each case, shall be true and correct as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and the representations and warranties of Seller made in this Agreement that are not qualified by a materiality standard, in each case, shall be true and correct in all material respects as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date), and Purchaser shall have received a certificate signed by an authorized officer of the Seller on behalf of the Seller, dated as of the Closing Date, to the foregoing effect.

(b) Performance of the Obligations of Seller. Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is a party that are to be performed by it on or before the Closing Date (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), and Purchaser shall have received a certificate signed by an authorized officer of the Seller on behalf of the Seller, dated as of the Closing Date, to the foregoing effect.

(c) Consents. All required consents, approvals and actions of, filings with and notices to any Person or Governmental Authority set forth on Schedule 4.4(b) shall have been duly obtained, delivered, made or given and shall be in full force and effect.

(d) No Material Adverse Effect. There shall not have occurred an event or failure to act causing a Material Adverse Effect.

(e) Bankruptcy Court Approval. The Bankruptcy Sale Order shall have been entered and shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement. The Bankruptcy Sale Order shall have become a final and nonappealable order, unless this condition has been waived in writing by Purchaser in its sole discretion.

(f) <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(g) <u>Credit Bid Approval</u>.  The Bankruptcy Court shall have entered an order, binding on all parties in interest in the Bankruptcy Cases (which order may be the Bankruptcy Sale Order) unconditionally allowing, authorizing and approving the credit bid by Purchaser contemplated by this Agreement pursuant to Section 363(k) of the Bankruptcy Code of (i) a Claim by Purchaser in the Bankruptcy Cases in an amount equal to the Obligations and (ii) a Claim by Purchaser in the Bankruptcy Cases in an aggregate amount equal to Expense Reimbursement.

(h) <u>Bidding Procedures Motion</u>.  On or prior to September 3, 2009, the Bidding Procedures Motion shall have been filed in the Bankruptcy Cases.

(i) <u>Bidding Procedures Order</u>.  On or prior to September 15, 2009, the Bidding Procedures Order shall have been entered in the Bankruptcy Cases.

(j) <u>Bankruptcy Sale Order</u>.  On or prior to October 29, 2009, the Bankruptcy Sale Order shall have been entered in the Bankruptcy Cases.

(k) <u>Assumption, Sale and Assignment of Contracts</u>.  Subject to <u>Section 6.5</u>, the Assignable Contracts designated hereunder as Assigned Contracts shall be so assumed, sold and assigned to Purchaser by order of the Bankruptcy Court satisfactory to Purchaser.

**ARTICLE 10**
**CLOSING AND DELIVERIES**

10.1     <u>Closing.</u>

The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "<u>Closing</u>") shall be held two (2) Business Days after the date that all conditions to the parties' obligations to consummate the transactions contemplated herein have been satisfied (the "<u>Closing Date</u>") (except for closing conditions that by their terms can only be satisfied on the Closing Date) or, if applicable, waived by the appropriate party or parties, at 10:00 a.m., local time, in the offices of Olshan Grundman Frome Rosenzweig & Wolosky LLP, or on such other date or at such other place and time as may be mutually agreed to in writing by the parties.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

10.2     <u>Seller's Deliveries.</u>

At the Closing,

(a) the sale, transfer, assignment, conveyance and delivery by Seller of the Acquired Assets to Purchaser shall be effected by the execution and delivery by Seller of (i) the

Bill of Sale, (ii) the Assignment and Assumption Agreement, and (iii) such special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to Purchaser;

(b) Seller shall have executed and delivered to Purchaser, to the extent required by Purchaser, any Ancillary Agreements;

(c) Seller shall have executed and delivered to Purchaser a duly executed assignment and assumption of lease for each Leased Property, with such modifications as are necessary to properly describe such Leased Property (collectively, the "Lease Assignments");

(d) Seller shall have executed and delivered to Purchaser duly executed assignments of (i) the patents and trademarks that are included in Intellectual Property (if applicable), in forms suitable for recording in the United States Patent and Trademark Office, and (ii) duly executed assignments of the copyright registrations and applications for copyright registration owned by the Seller that are included in Intellectual Property (if applicable);

(e) Seller shall deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in Section 9.2(a) and Section 9.2(b), in form and substance satisfactory to Purchaser;

(f) Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price;

(g) Seller shall deliver possession of the Acquired Assets;

(h) Seller shall deliver a duly and properly authorized and executed Organizational Amendment;

(i) Seller shall deliver a certified copy of the Bankruptcy Sale Order;

(j) Seller shall deliver final copies of the Schedules hereto; and

(k) Seller shall deliver all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Acquired Assets to Purchaser.

10.3    Purchaser's Deliveries.

At the Closing,

(a) Purchaser shall credit the Purchase Price against the Obligations;

(b) Purchaser shall pay in cash the amount required to pay the Cure Amounts;

(c) Purchaser shall execute and deliver to Seller the Assignment and Assumption Agreement;

(d) Purchaser shall execute and deliver to Seller the Lease Assignments;

(e) Purchaser shall deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in Section 9.1(a) and Section 9.1(b), in form and substance satisfactory to Seller; and

(f) Purchaser shall execute and deliver to Seller such other instruments of conveyance and transfer, in form and substance reasonably acceptable to the Seller, as may be necessary to convey the Acquired Assets to Purchaser.

## ARTICLE 11
## TERMINATION

11.1    Conditions of Termination.

This Agreement may be terminated only in accordance with this Section 11.1.  This Agreement may be terminated at any time before the Closing as follows:

(a) by mutual written consent of Seller and Purchaser;

(b) automatically and without any action or notice by either Seller to Purchaser, or Purchaser to Seller, immediately upon:

(i)     the issuance of a final and nonappealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii)    approval by the Bankruptcy Court of an Alternative Transaction;

(iii)   acceptance by Seller of an Alternative Transaction; or

(iv)    Purchaser not being declared the winning bidder upon completion of the Auction.

(c) by Purchaser:

(i)     if the Bidding Procedures Order shall not have been entered by September 15, 2009, unless agreed to in writing by Purchaser;

(ii)    if the Auction has not concluded by October 28, 2009, unless agreed to in writing by Purchaser;

(iii)   if the Bankruptcy Court has not entered the Bankruptcy Sale Order by October 29, 2009 (or such later date as Purchaser may have designated in writing to Seller);

(iv)    if there has been a violation or breach by Seller of any material representation, warranty or covenant contained in this Agreement that (x) has rendered the satisfaction of any condition to the obligations of Purchaser impossible or not curable or, if

35

curable, has not been cured within five (5) Business Days following receipt by Seller of written notice of such breach from Purchaser, and (y) has not been waived by Purchaser;

(v)     at any time after November 10, 2009, if the Closing shall not have occurred and such failure to close is not caused by or the result of Purchaser's breach of this Agreement;

(vi)     if, prior to the Closing Date, Seller's Bankruptcy Cases shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee or examiner with expanded powers is appointed in the Bankruptcy Cases;

(vii)     if Purchaser's obligations under the DIP Facility are terminated;

(viii)     if either of the interim or final order authorizing and approving the DIP Facility has not been entered within the time periods set forth therein, unless agreed to in writing by Purchaser; or

(ix)     if there shall be excluded from the Acquired Assets any Assigned Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and such Assigned Contract shall, in the opinion of Purchaser in its absolute discretion, prevent it from effectively operating the Business; or

(x)     if Purchaser so elects in writing pursuant to Section 6.6 hereof.

(d) by Seller, if there has been a violation or breach by Purchaser of any material representation or warranty contained in this Agreement that (x) has rendered the satisfaction of any condition to the obligations of Seller impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Purchaser of written notice of such breach from Seller, and (y) has not been waived by Seller.

## 11.2     Effect of Termination.

In the event of termination pursuant to Section 11.1, this Agreement shall become null and void and have no effect and neither party shall have any liability to the other (other than those provisions of Article 11 and Article 12 that expressly survive termination), provided, however, that nothing in this Section 11.2 shall relieve Purchaser or Seller of any liability for a breach of this Agreement prior to the date of termination.

## 11.3     Expense Reimbursement.

(a) If this Agreement is terminated pursuant to (x) Section 11.1(c)(ii), Section 11.1(c)(iii), Section 11.1(c)(iv), Section 11.1(c)(v), Section 11.1(c)(vi) or Section 11.1(c)(viii), solely if the event specified in such applicable Section occurs as a direct result of Seller's actions or inactions, or (y) Section 11.1(b), Section 11.1(c)(i), Section 11.1(c)(vii) or Section 11.1(c)(ix), Purchaser shall be deemed to have earned the Expense Reimbursement. The Expense Reimbursement shall be a super-priority administrative expense priority obligation under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in

Sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-priority claims of the Seller's post-petition lenders.

(b) Purchaser shall have no right to the Expense Reimbursement if this Agreement is terminated pursuant to Section 11.1(a) or Section 11.1(d).

(c) The Expense Reimbursement shall be paid in Cash, without further order of the Bankruptcy Court, only upon and contemporaneous with, the Closing of an Alternative Transaction.

(d) Seller hereby acknowledges that the obligation to pay the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement, and shall have super-priority administrative status against Seller and its estate.

## ARTICLE 12
## MISCELLANEOUS

12.1    Survival.

No representations, warranties, covenants and agreements of Seller and Purchaser made in this Agreement shall survive the Closing Date except where, and only to the extent that, the terms of any such covenant or agreement expressly provide for obligations extending after the Closing, including Purchaser's assumption of the Assumed Liabilities or as otherwise expressly provided in this Agreement.

12.2    Further Assurances.

At the request and the sole expense of the requesting party, Purchaser or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

12.3    Successors and Assigns.

(a) Purchaser shall have the right to assign to an Affiliate any of its rights or obligations in whole or in part (including the right to acquire any of the Acquired Assets). In the event of any assignment pursuant to this Section 12.3(a), Purchaser shall not be relieved of any liability or obligation hereunder.

(b) Purchaser shall have the right to assign this Agreement or any of its rights or obligations hereunder as collateral to any lender of Purchaser; provided, however, that no such assignment shall relieve Purchaser of its obligations to Seller hereunder.

(c) Except as provided in Section 12.3(a) and Section 12.3(b), Seller shall not assign this Agreement or any of its rights or obligations hereunder and any such assignment shall be void and of no effect. This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto, including any trustee appointed in any of the Bankruptcy Cases or subsequent chapter 7 cases and Seller, if the Bankruptcy Cases are

dismissed. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided above.

12.4    Governing Law; Jurisdiction.

This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of New York (without giving effect to the principles of conflicts of laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in New York.

12.5    Expenses.

Except as otherwise provided in this Agreement, each of the parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding shall be entitled to have and recover from the non prevailing party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

12.6    Severability.

In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

12.7    Notices.

(a) All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller:    GigaBeam Corporation
4021 Stirrup Creek Drive, Suite 400
Durham, North Carolina 27703
Attention: S. Jay Lawrence
Facsimile: (919) 544-8470

With a copy (which shall not constitute notice) to:

Ciardi Ciardi & Astin
919 N. Market Street, Suite 700
Wilmington, Delaware 19801
Attention: Daniel K. Astin, Esq.
Facsimile: (302) 658-1300

If to Purchaser:

Midsummer Investment, Ltd.
c/o Midsummer Capital, LLC
295 Madison Avenue, 38th Floor
New York, New York 10017
Attention: Michel Amsalem
Facsimile: (212) 624-5040

With a copy (which shall not constitute notice) to:

Olshan Grundman Frome Rosenzweig & Wolosky LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Attention: Adam H. Friedman, Esq.
Facsimile: (212) 451-2222

(b) Any party may change its address or facsimile number for the purpose of this Section 12.7(b) by giving the other parties written notice of its new address in the manner set forth above.

12.8    Amendments; Waivers.

This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Seller, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

785415-6

12.9    Entire Agreement.

This Agreement and the other Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  All Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

12.10    Publicity.

Neither the Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of the Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Seller list securities, provided that the party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

12.11    Headings.

The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.12    Counterparts; Facsimile Copies.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement.  Signed facsimile copies of this Agreement will legally bind the parties to the same extent as original documents.

12.13    Negotiated Agreement.

Each of the Seller and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its representatives drafted such provision.

12.14    Construction.

Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" means including without limitation.  Any reference to the singular in this Agreement shall also include the plural and vice versa.

12.15  Waiver of Jury Trial.

EACH PARTY HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

12.16  General Release.

Effective upon the Closing, Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of Purchaser's pre-Petition Date Claims, Encumbrances, and Liens) against Purchaser and any of its Related Persons, that directly or indirectly arise out of, are based upon, or in any manner are connected with the pre-Petition Date agreements to which Purchaser (or its Affiliates) and the Seller were parties and all transactions referred to in such agreements (the "Released Claims"). Should any Released Claims nonetheless exist, the Seller, on behalf of itself and its estate, hereby (i) releases and discharges each of Purchaser and its Related Persons from any liability whatsoever on such Released Claims and (ii) releases, waives and discharges all such Released Claims against Purchaser and its Related Persons.

[Signatures on following page]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PURCHASER:**

MIDSUMMER INVESTMENT, LTD.

By: _____

    Name: Michel A. Amsalem

    Title: Director

**SELLER:**

GIGABEAM CORPORATION

By: _____

    Name: Samuel J. Lawrence

    Title: CEO

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

785415-6

# DISCLOSURE SCHEDULES

These Disclosure Schedules are being furnished by GigaBeam Corporation ("GigaBeam" and, together with its wholly owned subsidiary GigaBeam Service Corporation, the "Seller") to Midsummer Investment, Ltd. (individually and as Agent, the "Purchaser") pursuant to the Asset Purchase Agreement dated as of September 2, 2009 by and between Seller and Purchaser (the "Agreement"). Unless the context otherwise requires, all capitalized terms used in these Disclosure Schedules shall have the respective meanings assigned to them in the Agreement.

No disclosure in these Disclosure Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has occurred.

These Disclosure Schedules and the information and disclosures contained in these Disclosure Schedules are intended only to qualify and limit the representations, warranties and covenants of Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any such representations, warranties or covenants.

The bold-faced headings contained in these Disclosure Schedules are included for convenience only, and are not intended to limit the effect of the disclosures contained in these Disclosure Schedules or to expand the scope of the information required to be disclosed in these Disclosure Schedules.

**Schedule 1.1(a)**

## <u>Liens for Taxes not yet due</u>

None