# THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | Case No. 09-13113 (MFW) |
| GigaBeam Corp.,[1] | : | |
| | : | Re: Docket No. 5 |
| Debtor. | : | |
| | : | |

## DECLARATION OF JOHN BAMBACH IN SUPPORT OF SALE

John Bambach makes this Declaration pursuant to 28 U.S.C. § 1746, and states:

1. I am a Managing Director with the firm of Focus Management Group USA, Inc. ("Focus"). Focus is the financial advisor and investment banker for the above-captioned debtor and debtor in possession (collectively, the "Debtors"). The retention of Focus as financial advisor and investment banker was approved by the Court on September 28, 2009 [Docket No. 65].

2. I submit this Declaration in connection with the Debtor's Motion for Order pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 (I)(A) Approving Procedures in Connection with Sale of Debtor's Assets; (B) Approving Form of Asset Purchase Agreement; (C) Scheduling Auction and Hearing to Consider Approval of Sale; (D) Approving Procedures Related to Assumption of Certain Executory Contracts and Unexpired Leases; (E) Approving Form and Manner of Notice thereof; and (F) Granting Related Relief; and (II)(A) Authorizing Sale of Such Assets pursuant to Asset Purchase Agreement, Free and Clear of All Liens, Claims, Encumbrances and Other Interests; (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

---

[1] The Debtor is GigaBeam Corporation, tax identification number **-***7757.

Related thereto; and (C) Granting Related Relief [Docket No. 5](the "Sale Motion"). All facts set forth in this Declaration are based either on my personal knowledge, information supplied to me by people who report to me as Managing Partner of Focus, or upon information obtained from the Debtor's Chief Executive Officer, Samuel J. Lawrence. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration of behalf of the Debtor.

3. Immediately prior to the filing of the Debtor's petition for bankruptcy relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), the Debtor retained Focus to assist the Debtor regarding, among other things set forth in the Debtor's application to retain Focus:

    a)    the development of proposed bidding procedures for the sale of substantially all of the Debtor's assets (the "Assets"),

    b)    the evaluation of the stalking horse bid received by the Debtor,

    c)    the development of sales material to market substantially all of the Debtors' assets,

    d)    the identification and contact of strategic and financial buyers to garner interest in the purchase of the Debtors' assets,

    e)    communication with potential bidders, coordination of the provision of information regarding the Debtors' businesses and assets to interested parties,

    f)    the maintenance of a data room to provide access to critical data for potential purchasers in order to conduct due diligence and evaluate the proposed sale (the "Sale") and the Debtor's assets, and

  g)  a proposed auction to be held if competing bids were received by the Bid Deadline (as defined in the Sale Motion).

4. To garner interest in the purchase of the Assets, Focus contacted over 77,000 potential parties either defined as strategic buyers/partners, financial buyers, competitors or otherwise who may have an interest in the Debtor's business. Specifically, email advertising was placed with Wi-Max and Fierce Wireless. A "teaser" regarding the Sale was sent to 20,000 subscribers of Wi-Max on September 10, 2009, and another "teaser" was sent to 51,000 Fierce Wireless subscribers on September 10, 2009.

5. Focus also sent a "teaser" to approximately 6,000 targeted purchasers via electronic mail. Focus examined advertising in trade journals and investment journals but determined that the targeted approach of the above mailings was a more focused effort with immediate implementation.

6. Focus assisted the Debtor in placing the publication notice approved by the Court in the New York Regional Edition of the Wall Street Journal, which has a circulation of 390,000, for one day and on the website of the Wall Street Journal for a duration of 30 days. In Focus's experience, such notice was reasonable and sufficient, and the notice is compliant with the bid procedures order entered by the Court on September 14, 2009 [Docket No. 48].

7. Once interest was received from Focus's extensive marketing efforts, Focus followed up on all known potential leads received by Focus, the Debtor, and the Debtor's professionals. Prior to the October 16, 2009 bid deadline, Focus received twenty requests for confidentiality agreements, which, if executed would enable interested parties to access the Focus data room. Thereafter, Focus received sixteen executed confidentiality agreements. The

parties requesting confidentiality agreements consisted of equity buyers, strategic buyers and company referrals as follows:

| Classification | Number of Requests | CA's Executed |
|---|---|---|
| Equity buyers | 3 | 3 |
| Strategic Buyers | 14 | 11 |
| Company Referrals | 3 | 2 |

Focus also received one inquiry regarding the purchase of parts and inventory, but such inquiry was not for a price competitive to the going forward valuation of the business.

8. Given the ability of Focus to promptly contact parties who may have had interest in the Debtor's assets, and given the interest received to date, Focus believes that the timeline set for the Sale was sufficient to provide interested parties with an opportunity to submit a bid and complete due diligence. Based upon the Debtor's financial performance, the type of industry in which the Debtor conducts business, and current economic conditions, the interest received in the sale process was higher than expected.

9. Focus's marketing efforts and the sale process were conducted in accordance with the bidding procedures approved by the Court. Moreover, the bidding procedures were designed to maximize the value received for the Assets. Under the facts and circumstances of this chapter 11 case, the bidding process provided bidders with ample time and information to submit a timely bid. Through this process, the Debtor subjected the value of the Assets to market testing and permitted prospective purchasers to bid on the assets. Therefore, the Debtor and all parties in interest can be assured that the consideration received for the Assets is fair and reasonable. The Debtor (a) afforded all parties interested in potentially purchasing the Assets a full, fair and reasonable opportunity to qualify as bidders in accordance with the terms and conditions of the bidding procedures and to submit their highest or otherwise best offer to purchase the Assets, and

4

(b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Assets. No party inquiring regarding the purchase of the Debtor's assets had issues any with the timing of the sale or the adequacy of information available to them, and none of these parties requested additional time for due diligence or otherwise. Accordingly, these procedures obtained the highest and otherwise best value for the Assets for the Debtor and its estate. In my opinion, the bidding procedures served their purpose and additional time for bidding would not have increased interest or any potential purchase price.

10. Despite Focus's efforts, no competing bids were received, and the offer submitted by Midsummer Investment, Ltd., individually and as agent or its assignee or designee, the stalking horse bidder (the "Purchaser"), was not only the highest and best offer, but was the only offer received. The Purchaser submitted a credit bid for the purchase of the Assets set forth in the APA in the amount of $6,096,579.42.

11. The offer of the Purchaser, upon the terms and conditions set forth in the Asset Purchase Agreement, including the form and total consideration to be realized by the Debtor pursuant to such agreement, (i) is the highest and best offer received by the Debtor, (ii) is fair and reasonable, (iii) is in the best interest of the Debtor, its creditors and estate, (iv) constitutes full and adequate consideration and reasonably equivalent value for the Assets, and (v) will provide a greater recovery for the Debtor's estate and creditors and other interested parties than would be provided by any other practically available alternative.

12. More than ample business justification exists to sell the Assets to the Purchaser. The sale process achieved the highest and best price for the Assets. Furthermore, the Debtor does not have sufficient funding to delay the sale process for any significant period of time beyond the timeframe approved by the Court, and the Assets will only decline in value absent a

prompt sale. As of the Petition Date, the Debtor had only $200 in cash available for operations. Certain of the Purchasers advanced up to $1 million to enable the Debtor to continue to operate. Such funding enabled the Debtor to pay its employees and provide employee benefits, service customers, pay critical trade vendors upon the terms approved by the Court, and preserve the estate so that business could continue through the sale process. Through the Sale, the Purchaser is assuming certain liabilities that will benefit the estate such as certain liabilities to employees and to the lessor for the Debtor's California offices. Without approval of the Sale, the Debtor will be forced to liquidate and terminate its employees. Given the efforts to obtain funding and sell its assets before the Petition Date, the pending Sale was the only viable alternative for the Debtor to preserve the estate and represents sound business judgment. The relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtor's estate for the benefit of its stakeholders.

13. Approval of the Sale to the Purchaser is crucial to maximize the value of the Debtor's estate and distributions to creditors. I reviewed the Debtor's projections for 2010 and 2011 and believe the Purchaser's credit bid of over $6 million provides a valuation of the business at fourteen times the projected 2010 EBITDA. In view of the steady deterioration of the Debtor's liquidity position and the amount of the credit bid received, and in order for the Debtor to ensure that it has sufficient liquidity to continue its operations and preserve the value of its business and be able to provide continued employment for approximately 15 people, it is imperative that the Sale be approved.

14. The Sale should be approved free of all liens, claims, encumbrances, and interests. The Assets can be sold free and clear of all liens, claims, encumbrances, and interests because any parties asserting a lien, claim or interest in the Assets has either consented to the Sale in the

case of the DIP Lenders; or any parties asserting a lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. Accordingly, approval of the Sale free and clear of all adverse interests is warranted. Not selling the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances would adversely impact the Debtor's estate as a sale of the Assets other than one free and clear of Liens, Claims, Encumbrances and Interests would be of substantially less value to the Debtor's estate.

15. The APA was an intensely-negotiated, arms-length transaction, in which the Purchaser acted in good faith and without collusion or fraud of any kind. Neither the Debtor, nor the Purchaser, have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of, or otherwise implicate, section 363(n) of the Bankruptcy Code to the APA or to the consummation of the sale transaction and transfer of the Assets and Assigned Contracts (as defined in the Sale Motion) to the Purchaser. The Purchaser acted in good faith by providing the DIP Facility to enable the Debtor to continue to operate for the benefit of its employees, critical vendors and other stakeholders and to encourage a robust sale process. The Purchaser is entitled to all the protections and immunities of section 363(m) of the Bankruptcy Code. Indeed, the Purchaser's identity has been fully disclosed in these proceedings, and the Debtor has fully disclosed and requested the Court's approval of all of the terms and conditions of the Sale. Accordingly, the Debtor believes that the Purchaser has offered to purchase the Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

16. The Purchaser can adequately perform in the future with respect to the Assigned Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code. The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order are integral to the APA

and are in the best interest of the Debtor, its estate and creditors and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtor.

17. As described above, time is clearly of the essence as the Debtor lacks sufficient funding to operate its business on a prolonged basis. Since promptly closing the Sale is of critical importance, the ten-day stay period required under Bankruptcy Rules 6004(h) and 6006(d) should be waived.

18. In conclusion, for the reasons stated herein and in the Sale Motion, I respectfully request that the Sale Motion be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Dated: October 26, 2009  Focus Management Group USA, Inc.
Wilmington, Delaware

*/s/ John Bambach*
John Bambach, Managing Director